**UNITED STATES of America, Plaintiff,**

**v.**

**Michael E. JONES aka Abe, Defendant.**

**and**

**UNITED STATES of America, Plaintiff,**

**v.**

**Ralph M. PFEISTER aka
Peg, Defendant.**

**Nos. LR–CR–85–21(1), LR–CR–85–21(3).**

United States District Court,
E.D. Arkansas, W.D.

Nov. 1, 1985.

George Proctor, U.S. Atty. by Terry Derden and Sherry Bartley, Little Rock, Ark., for Government.

R. David Lewis, Little Rock, Ark., for Jones.

Paul Johnson, Little Rock, Ark., for Pfeister.

## MEMORANDUM OPINION

ROY, District Judge.

The defendants, Michael E. Jones and Ralph M. Pfeister, were charged by indictment, along with twenty-one other individuals with various counts of drug offenses. The cases involving all of the defendants except Jones and Pfeister have been disposed of by the entering of guilty pleas by the defendants or dismissal by the Government. Defendants Jones and Pfeister were tried before the Court after the entry of jury waivers signed by the defendants. The Government orally advised the Court that it had no objection to the jury waivers. The Court approved the waiver and therefore, the requirements of Federal Rule of Criminal Procedure 23 were satisfied. The trial of the defendants was held before the Court on September 3, 1985 through September 9, 1985 and the Court has now received all of the post-trial briefs.

## INDICTMENT

I. Jones, Michael E.

A. The defendant Michael E. Jones is charged in Count I with engaging in a continuing criminal enterprise by committing the offenses set forth in the Indictment and the Overt Acts in Count Two. 21 United States Code § 848.

B. The defendant Jones is charged in Count II with conspiring to possess with the intent to distribute methamphetamine, amphetamine, and cocaine.[1] It is alleged, as a part of the conspiracy, that Michael E. Jones would sell methamphetamine, amphetamine, and marijuana. The defendant Jones is mentioned in Overt Acts 1, 3, 4, 6, 7, 8, 9, 12, 13, 15, 17, 18, 20, 21, 24, 26, 27, 42, 44, 45 and 46. 21 United States Code § 846.

C. The defendant Jones is charged in Counts III, IV, V, VI, VII, IX and X with the knowing and willful distribution of amphetamine and methamphetamine. 21 United States Code § 841.

D. The defendant Jones is charged in Counts XXIII, XXIV and XXV with unlawful use of a communication facility in facilitating the commission of the conspiracy as alleged in Count II. 21 United States Code § 843(b).

II. Pfeister, Ralph M. (Pfeister was also charged in Count VIII, but during the course of the trial said Count was dismissed by the Government.)

A. The defendant Ralph M. Pfeister is charged in Count I with engaging in a continuing criminal enterprise by committing the offenses set forth in the Indictment and those specified in Count II Overt Acts. 21 United States Code § 848.

B. The defendant Pfeister is charged in Count II with conspiring to possess with the intent to distribute and to distribute methamphetamine, amphetamine, and cocaine. It is alleged, as a part of the conspiracy, that Pfeister would purchase and distribute marijuana, methamphetamine, and cocaine. The defendant Pfeister is mentioned in Overt Acts 6, 7, 13, 21, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 41, 43, 44, 45 and 46. 21 United States Code § 846.

C. The defendant Pfeister is charged in Counts XXIII, XXVI, XXVII and XXVIII with unlawful use of a communication facility in facilitating the commission of the conspiracy as alleged in Count II. 21 United States Code § 843(b).

---

**1.** Amphetamine/methamphetamine are chemically different but are often used interchangeably, according to the witnesses.

The period of time covered by the indictment is from on or about January 1983 and continuing thereafter up to and including the 21st day of February, 1985.

## FACTS

The Government presented numerous witnesses who testified as to the relationship of Jones and Pfeister in various drug transactions, the methods they used in carrying out various drug transactions and the relationship of Jones and Pfeister to the people with whom they dealt.

### Testimony of Jack Branch

One of the Government's principal witnesses was Jack Branch, who acted as a government informant. Branch testified in detail about the extensive drug operations of Jones, Pfeister and others associated with them. In 1984 Branch was arrested on a bank robbery charge and at that time Branch agreed with the state and United States authorities to cooperate and testify concerning drug investigations in Arkansas. He testified that he was paid expenses by the United States during the investigation.

Branch had numerous dealings with Michael Jones prior to the time he became a government informant. Both methamphetamine and marijuana were fronted to him by Jones on a consignment basis for an extended period of time. Branch had paid as much as $1,650.00 per ounce for amphetamine/methamphetamine, and received approximately one ounce per week from 1983 through March of 1984. Branch sold a total of ten to fifteen pounds of marijuana which he obtained from Jones. Jones was aware of the individuals to whom Branch sold, and Jones had others selling for him. Jones also directed Wally Kendrick and Branch to cease dealing with Ralph Pfeister when he learned they were obtaining methamphetamine directly from Pfeister.

Alan Koller became indebted to Branch and Branch in turn became indebted to Jones. Lonnie and Bobbie Staton were also buying from Koller and, when Jones discovered the Statons had also been buying from another individual, Jones informed Branch that he and Robert Crain had assaulted that individual.

When Branch became a government informant in 1984 he again made contact with Michael Jones and discussed getting back into the drug business with Jones.[2]

Branch began making numerous purchases of drugs from Jones and was searched before and after each purchase. His clothing and his vehicle were searched thoroughly on each occasion by the appropriate government agents. He was also under surveillance each time he made a purchase from the Jones residence. Branch's purchases as an informant began in April, 1984 and continued through September of 1984. Branch purchased anywhere from one-eighth of an ounce to one ounce of amphetamine/methamphetamine from Jones on these numerous occasions.

Branch called Jones on April 12, 1984 to arrange payment for an April 10th purchase and at that time he inquired about going "up north" with Jones. Branch met with Jones on this date and Jones informed him that he was going to Harrison, Arkansas to dry out and pick up six ounces of amphetamine/methamphetamine and some marijuana. At one meeting with Branch, Jones discussed the fact that Alan Koller owed Jones for marijuana and amphetamines. Jones stated that he'd "fuck him up if I see him" and when Branch asked Jones what Koller had done, Jones stated: "Oh, I gave him a half pound the other day, here while back, week before last, and I told him 'Alan whatever you do, don't be late, this is your last chance.'" Jones also stated that he had informed Lonnie Ray

---

**2.** Branch stated that he was hospitalized in September of 1983 for injuries sustained in an altercation unrelated to this case. He later learned from Alan Koller and Jones that all of his sales and customers had been transferred to Koller. At this time Jones told Branch that everything Koller made would be applied to the bill that Koller owed because of drug purchases from Branch. Branch had no sources other than Jones until he was arrested on the bank robbery charge in 1984.

Staton to stop dealing with Koller for "a while." Branch stated that his transactions always occurred in a part of Jones' house that Jones referred to as "the office."

At another meeting with Jones, Branch learned that one Robert Crain, aka Cowboy, and Jones were soon to be en route to Harrison, Arkansas to obtain more amphetamine/methamphetamine. During one of his visits to Jones' residence Branch saw Pfeister, Margaret Swanson and other individuals. On that occasion, Branch saw approximately eight ounces of a yellow-colored substance represented to him to be amphetamine/methamphetamine.

On May 2, 1984, Branch again saw the yellow substance. at the Jones' residence. At this meeting Branch was wearing a body recording device. The recording reproduced a conversation between Jack Branch, Michael Edward Jones, Art Downs and Lloyd Chaney. In this conversation the participants discussed the sale of three firearms that were in the possession of Chaney, and Jones made a statement concerning a .41 caliber pistol that "this one's hot, this is the one Peg gave me." Jones confirmed that he had eight ounces of yellow substance and the parties discussed the sale and purchase of marijuana. Further, in this meeting Branch requested Jones' permission to purchase from Wally Kendrick and Jones stated "he wouldn't do him no good either ... only place he can get it is from me."

Branch identified Government Exhibit # 25, which is described as a .41 Ruger revolver, stating that it appeared to be similar to the gun which he observed on that date in Jones' residence. (John Spurgeon testified for the United States and identified the firearm as being seized from the residence of Robert Earl Crain. Charles Roark testified that the firearm had been stolen from his house sometime in February, 1982.)

Toward the end of May, 1984, Branch met at the Jones' residence with Jones, Robert Earl Crain and a number of other people. At this meeting Branch had a private conversation with Crain. Crain stated that Branch could obtain methamphetamine from Crain, but that Branch could not tell Jones about the sale. Branch had a private conversation with Jones on this same date and Jones informed him that Jones was on his way to Harrison to obtain more amphetamine/methamphetamine. On the following day, in late May of 1984, Branch accompanied Jones to northern Arkansas to meet with Heather McLaughlin (Pfeister's secretary). Branch observed Jones pay Heather McLaughlin approximately $3,000.00 which Jones stated at the time was for the purchase of drugs; Jones had promised Pfeister he would get the money to Pfeister.

After a June 4, 1984 payment to Jones, Branch's attentions were directed to Phillip Goyne and Robert Crain, and Branch made several purchases from Crain. On June 6, 1984, Branch had a discussion with Crain concerning Jones wherein Crain explained that the Longview connection now belonged to Crain and that the Harrison connection belonged to Jones. Crain stated that he could not go to Harrison as his source and that Jones could not go to Longview.

On June 8, 1984 Branch made arrangements for a second purchase from Crain and at that time he had a conversation with Crain concerning the quality of Jones' amphetamine/methamphetamine. At this meeting, Branch was informed by Crain that Crain had observed the yellow amphetamine/methamphetamine that had been in the possession of Jones and that Crain had four ounces of that same substance in his possession at that time.

During this time period he met with Phillip Randall Goyne and Robert Crain and allowed Crain to borrow his car to go to Longview, Texas to obtain methamphetamine. Crain returned his car and told Branch that Crain did not want Jones knowing that Crain was doing drug business with him.

On June 20, 1984 Branch attempted to reach Jones by telephone and at that time had a conversation with Paul Delaney, aka Weasel. In this conversation Delaney in-

formed Branch that Jones was gone and had "real bad problems" that could not be discussed on the telephone. Delaney stated that he was collecting anything anybody owed Jones on this date. Branch also met with Judy Delaney and stated that he informed Mr. and Mrs. Delaney that Jones was owed a lot of money for drugs, whereupon Mr. and Mrs. Delaney stated that they were there to collect the money. They also said that the house had been cleaned out and that no drugs had been left there and that if Branch needed drugs he should see Crain.

Several days later Branch was called by Judy Delaney and instructed to come to the Jones' residence. When he arrived at Jones' residence Branch met with Jones and Paul Delaney. Jones informed Branch that he had beaten David Briscoe over some money and a gun and that during the beating the gun "went off." Branch had known David Briscoe for approximately seven years and had known through Briscoe that Briscoe was purchasing methamphetamine from Jones through Wally Kendrick. Jones directed Branch to go see Briscoe in the hospital and determine whether Briscoe was going to press charges, and if Briscoe intended to press charges, to threaten him in order to keep him from doing so. Branch was unable to see Briscoe at this point, but he did contact Lonnie and Bobbie Staton as directed by Jones. The following day Branch returned to the University of Arkansas Medical Center and was able to see Briscoe. Briscoe told Branch that he did intend to press charges as soon as he could get out of the hospital and get to a safe place. Branch then met with Jones but told Jones that Briscoe would not press charges.

At a taped meeting on June 26, 1984 Branch informed Jones of Briscoe's condition and that Briscoe wouldn't be testifying. Branch also informed Jones that he had called Lonnie Ray Staton as requested by Jones and that Staton would talk to Alan Koller. The transcript of the recorded meeting indicates that Branch asked if "they" had come back from out-of-town. Branch said this was a reference to the fact that Gary Wiggs and Robert Crain had made a trip to Longview, Texas to obtain amphetamine/methamphetamine.

Branch next talked to Jones in a recorded telephone conversation on June 29, 1984 wherein Jones stated that the beating of David Briscoe was just an "object lesson." Branch met again with Jones the following day, June 30, 1984, and attempted to purchase one-half ounce of methamphetamine for $1100.00; however, he was unable to make the purchase. On July 1, 1984, Branch returned and made a purchase of approximately six grams of methamphetamine.

On July 2 Branch returned, wearing a body recording device. In this conversation Branch and Jones discussed the fact that Branch did, in fact, deal with Jones in 1983 and that the price was "$550.00 a quarter." Jones stated that he was trying to keep something rolling and was four or five thousand dollars in the hole and that nobody had come up with his money. Jones informed Branch that he suspected that some persons had been going out to Crain's and obtaining controlled substances and not obtaining the substances from him, specifically mentioning Staton. Jones stated that that would be straightened up shortly and that he had a surprise for him. During this conversation Jones also stated that he was now carrying a .45 caliber pistol and that if he shot anybody again it would be on purpose and that he would empty the gun into him.

During this conversation Branch told Jones that he was grateful for Jones' trust. At this point Jones stated that "I told you a long time ago, that if you work with me and not try to work against me everything will work out." Jones also said that Koller owed him money and that he was going to hurt Koller when he saw him.

Jones said that Kendrick had left town because Jones had told him that he would be held responsible if Briscoe started talking to law enforcement. Branch again assured Jones that Briscoe would not testify against him. Jones was angry because

some of his customers had been going to Crain and purchasing drugs around Jones.

About this same time Branch met with Ralph Pfeister in Little Rock, Arkansas at a local motorcycle shop. He discussed supply and quality of methamphetamine and told Pfeister that he wanted to buy direct from him. Pfeister stated that he would be able to sell directly to Branch but that Pfeister would provide a percentage of the sale to Jones because Branch was a Jones customer. Pfeister also told Branch he took vehicles in trade for methamphetamine, specifically mentioning Kevin McDougal. Jones admitted on cross-examination that he fronted drugs to McDougal. Testimony from Branch confirmed that Pfeister had a serious drug habit and was employing drugs for personal use on almost every occasion that Branch saw him.

In a conversation with Jones before Jones left on a motorcycle run to Sturgis, Jones told Branch that he had ten pounds of marijuana which he would sell for $750.00. Jones further stated that he was showing a $2700.00 debt and that he had a lot more money than that out. At this time Branch saw a closed circuit T.V. system at the Jones' residence which allowed Jones to view the exterior of his residence from the area known as his office.

On the weekend following a July 19 purchase Branch accompanied Jones to Harrison and before leaving he assisted Jones in loading approximately ten pounds of marijuana into the trunk of the car to return to Pfeister. While at the Pfeister residence Branch observed Jones and Pfeister use a vacuum pump, which appeared to be a compressor out of a refrigerator, to pull excess moisture out of the amphetamine. He also saw Pfeister and Jones take an ounce of pure amphetamine, cut the ounce in a blender with a substance known as manitol, and produce two ounces of amphetamine. The amphetamine was weighed out into one-ounce packages and one ounce was distributed by Pfeister to Jones. After that, Pfeister and Jones weighed and transferred the marijuana.

Branch subsequently called Pfeister on August 6, 1984 requesting a "part" from Pfeister. Pfeister agreed and a price of $1700.00 was set for the "part." Pfeister said that he would pay Jones a percentage because he (Pfeister) was selling to Branch directly. Branch went to Harrison; he was wearing a body recording device at the time. He met Pfeister at Midway Cycle and purchased one ounce of amphetamine. In the recording on August 6, 1984, Branch and Pfeister made a reference to a stash can which Branch explained was a WD–40 brand spray oil can that had been altered to hide or secrete items inside. On this occasion Branch also saw Kevin McDougal at Midway Cycle and in a private conversation with him, McDougal stated that he was there for the same reason Branch was—to pick up some drugs.

On August 9, 1984, Branch met with Pfeister, paid $1700.00 and purchased approximately one ounce of amphetamine.

On August 16, 1984, Branch met with Pfeister and paid Pfeister $1700.00 for the purchase of one ounce of amphetamine. It was on this occasion that Branch was surprised to find Jones at the cycle shop in Harrison, Arkansas. Pfeister requested Branch to provide him with $1700.00 so that Pfeister could put it with other money that he had so he could purchase one-half pound of amphetamine. Branch provided Pfeister with the money and agreed to meet him later at the residence.

Pfeister stated to Branch at this time that Jones had made a lot of money while he was gone from the percentage Pfeister was paying him on Jones' Little Rock customers. While en route to the Pfeister residence, Jones and Branch had a private conversation wherein Jones stated that Pfeister had paid him some $1500.00 on Pfeister's sales to Jones' customers. It should be noted that Branch had made only two purchases from Pfeister at this time at $1700.00 per ounce.

While at the Pfeister residence Branch observed Pfeister with one-half pound of methamphetamine which was cut by adding other substances and placing the material

in a blender. Pfeister provided one ounce of amphetamine to Branch and Branch also observed Pfeister front one ounce to Jones.

In late August, 1984 the undercover operation was moved to Harrison. Branch met with Pfeister at Midway Cycle and discovered that Pfeister had obtained information that federal authorities might be looking into drug operations in that area. Branch's wife, Rose, had been seen talking to task force officers and was questioned by Pfeister concerning the incident.

In September of 1984 Branch made another purchase of amphetamine from Pfeister and during that meeting Pfeister directed Branch to contact Jones to pick up cash, and to contact Wally Kendrick and tell Kendrick to see Pfeister. Branch traveled to Little Rock, met with Kendrick and Jones, and returned to Pfeister's residence the following day. During a recorded conversation on September 19, 1984 Pfeister informed Branch that he was cutting his amphetamine/methamphetamine by fifty percent, and further informed Branch that he had two ounces of cocaine coming and $10,000.00 coming in marijuana. Pfeister told Branch that an individual by the name of "Butch" would soon be bringing in the cocaine. Branch later met "Butch" at Midway Cycle along with Sammy Spurlock. Branch identified "Butch" as Charles Suttinger. On the same day he met Suttinger and Spurlock and learned that they had arrived from South Carolina, he observed a quarter pound of cocaine at the Pfeister residence.

On the following day he had a conversation with Pfeister and Pfeister said that the cocaine would sell for $2,500.00 an ounce uncut or $2,000.00 an ounce if it were cut. It was on this occasion that Branch used cocaine in a situation in which he felt it was necessary to protect his undercover status.

On September 28, 1984, at Midway Cycle Shop, Branch purchased approximately one-quarter ounce of cocaine from Pfeister at a price of $600.00. During the time period that he was in Harrison, Branch had seen Ron and Laura Watson at the motorcycle shop, and in mid-October he learned from Pfeister that Pfeister had obtained some amounts of amphetamine/methamphetamine from Ron Watson.

During late October Branch and the undercover investigation returned to the Little Rock area. Branch reestablished contact with Robert Earl Crain for the purpose of making controlled purchases.

On January 18, 1985 Branch wore a body recording device and met with Crain. Crain was selling to Lonnie Staton and Staton was selling to Alan Koller. In his conversation, Crain related to Branch that Jones told Crain that the next time Lonnie Staton comes out to get dope from you (Crain) tell him (Staton) to come and see me instead. Crain related that he told Jones that the next time Staton came out for dope he would send him Abe's way. In this conversation, Crain also stated that he beat Alan Koller due to Koller's drug debt to Lonnie and Bobbie Staton. Crain stated that he told Koller that "you owe my brother Abe some money and when he finds out how I collected this he's liable to want me to come back with him, and if he does, I will." Crain also informed Branch that Phillip Randal Goyne aka Moe had traded property to Pfeister for drugs. Crain reiterated that Branch should keep his drug business with Crain secret from Jones.

### Testimony of Sanders and Burks

Sargent Don Sanders of the Arkansas State Police testified that on each occasion, Branch was searched before and after purchasing drugs or delivering money to Jones, Pfeister and the other subjects of the investigation. Sanders also testified to the foundation, editing, and preparation of transcripts for the Government's exhibits which were referred to and relied upon above. Sanders also testified as to the authenticity of the amounts and substance of amphetamines and methamphetamines which were purchased from Jones and Pfeister at different times.

Detective Ronnie Burks of the Organized Crime Drug Task Force testified as to the authenticity of the amounts and substance

of amphetamines and methamphetamines that were purchased from Jones and Pfeister on other occasions.

## Testimony of Allen and Chaney

Richard Allen and Lloyd Chaney were originally defendants in this case and the United States agreed that charges against them would be dismissed if they would testify truthfully.

Allen and Chaney began purchasing from Jones in March of 1984. They purchased marijuana from him ten to fifteen times at the price of $250.00 for one-quarter pound. At first they paid cash but Jones later began to sell to them on a consignment basis. They sold to four or five individuals. They also bought amphetamine/methamphetamine from Jones ten to fifteen times, purchasing approximately one to four grams at a time at a price of $80.00 to $100.00 per gram. They did not use the methamphetamine, but sold it and, according to both Allen and Chaney, Jones knew they were selling it.

All of the Allen/Chaney sales took place in the office of Jones' residence on Maple Street, and on several occasions they would have to wait in line in order to see Jones. Allen and Chaney used the telephone to call Jones concerning drugs and utilized the term "hot rod parts" in reference to the purchase of methamphetamine. Allen continued purchasing from Jones until August of 1984. Allen paid approximately $5,000.00 or more to Jones for the purchase of controlled substances.

Both Allen and Chaney testified they had observed a yellow substance purported to be methamphetamine in the possession of Jones.

## Testimony of Alan Koller

Alan Koller was originally a defendant in this action and made an agreement with the United States that charges against him would be dismissed if he testified truthfully.

Koller had known Jones since the summer of 1983 when he met Jones as a bartender at the Playpen beer joint. Koller purchased amphetamine/methamphetamine from Jack Branch and sold it to Lonnie and Bobbie Staton. After Branch was injured in an altercation, Jones brought one-quarter ounce of amphetamine/methamphetamine for Koller to sell and pay him back a week later. Koller was to take over Branch's distribution while Branch was in the hospital. Koller used some of the one-quarter ounce and sold the rest to the Statons, and didn't have enough money to pay Jones. Koller then gave Jones a gun to settle the debt. Koller continued to buy amphetamine for the Statons and then introduced Lonnie Staton to Jones. He also bought marijuana from Jones during the time period of the conspiracy.

Jones would only front small amounts to Koller after he got behind on his debt. After Koller began purchasing from Lonnie and Bobbie Staton on a consignment basis, he was contacted by Jones and informed that the Statons had turned over his debt to Jones. On one occasion Jones called Koller's wife, and on a second occasion (in November of 1984) Jones visited Koller's house and informed Koller that "it was almost too late."

During the time period he was purchasing from Branch and reselling to the Statons (spring of 1983), the Statons began to purchase their methamphetamine from an individual by the name of Mickey and stopped purchasing from Koller. Koller related this information to Branch, who was to tell it to Jones. Koller was later told by Jones that Jones had assaulted Mickey with a pistol and that the problem had been solved. After Jones assaulted the individual known as Mickey, the Statons again began purchasing their methamphetamine from Koller.

Koller also bought from and was fronted drugs by Wally Kendrick. Koller had seen Pfeister at Kendrick's residence but never purchased any drugs from Pfeister. Koller later (in the fall of 1984) became indebted to the Statons who had been obtaining their methamphetamine from Robert Earl Crain. Crain assaulted Koller because of this drug

debt to the Statons. Koller was told by Crain that Koller also owed money to Jones, and that if Jones wanted his debt collected Crain would come back and assault Koller again. Alan Koller's wife, Charlene Koller, confirmed his testimony.

### Testimony of Lonnie Staton

Lonnie Staton was originally a defendant in this case. He pleaded guilty to a charge of illegal use of the telephone, and agreed to testify in return for dismissal of the remaining charges against him. Staton began buying marijuana and amphetamine/methamphetamine in small amounts from Alan Koller approximately four to five years ago and later increased these amounts to up to one-eighth ounce at a time. After Staton was introduced to Branch by Koller, Koller began purchasing from him in the fall of 1983. Staton related that Branch and Koller were obtaining their methamphetamine and marijuana from Jones and referred to Jones as "the boss." During this period of time Staton also obtained amphetamine three or four times from another individual named Mickey Lawhorn. Lawhorn stopped selling because Lawhorn had been threatened and a gun had been fired at his house. Staton was informed by Branch and Koller that they had told Jones that the Statons were dealing with someone else and that Jones had assaulted Lawhorn in order to stop Lawhorn's sales of methamphetamine to Jones' customers. After this incident Staton again began purchasing from Koller and Branch.

In the winter months of 1983 Koller introduced Staton to Jones and Jones told Staton that he could deal directly with him. Staton regularly obtained amphetamine/methamphetamine from Jones, and along with his wife Bobbie, made sales to other people. Staton both paid cash for and was fronted drugs, depending on how badly Jones needed money. When the drugs were fronted Staton would have to pay for those drugs in five to seven days, the time period varying. Staton's wife Bobbie sold most of the methamphetamine

that he obtained from Jones. The most he ever owed Jones at one time was $1,000.00. Staton estimated the total amount that he paid Jones for drugs was between $4,000.00 and $5,000.00.

In the first part of June, 1984, Staton accompanied Koller to Jones' residence and Koller obtained a small amount of methamphetamine on a consignment basis from Jones. Jones threatened to assault Koller if he did not pay promptly. Jones told Staton that the term "hot rod parts" would be used as a reference to amphetamine/methamphetamine and that "stock parts" would be a reference to marijuana. Staton was told by Jones that if anyone mentioned drugs on the telephone that Jones would hang up the phone and come over to their residence and beat them with the phone. On one occasion Jones instructed Staton not to sell to Koller for a while because Koller's debt was getting too large.

Staton confirmed the testimony of earlier witnesses that he had seen a yellow type of methamphetamine at the Jones' residence and that he usually purchased white methamphetamine from Jones.

### Testimony of Lester (Wally) Kendrick

Lester (Wally) Kendrick testified on behalf of the government and stated that he had pleaded guilty in this case and had an agreement with the United States to testify truthfully in return for a reduction in the number of charges. The Court is aware of the inconsistent statements given by Kendrick at various stages of the proceedings and is urged by the defendants to disbelieve all of Kendrick's testimony for this reason. However, the Court finds it is almost undisputed that Kendrick was involved extensively in the "drug business" and to a certain extent his testimony was verified by that of other witnesses, tape recordings and circumstantial evidence. Because of his demeanor on the witness stand and the totality of the circumstances the Court finds his testimony at trial credible.

Kendrick testified that he had known Jones longer than Pfeister and that he purchased drugs from Branch for about one year in 1980–1981. Branch told Kendrick that the drugs were from Jones.

In late 1982 or early 1983 Kendrick met Pfeister at a bar and began purchasing marijuana from him in the summer of 1983. Kendrick started buying a one quarter pound and worked up to a pound a week at a price of $1,000.00 per pound. In the summer of 1983 he was also purchasing methamphetamine from Jones. From time to time, at Jones' request, he would take money from Jones, travel to Pfeister's, pick up amphetamine, and bring it to Jones. Kendrick estimated that he had done this on ten or twelve occasions. If a person bought from Pfeister and was from the Little Rock area, the customer had to pay Pfeister an extra $100.00 for Jones.

In the fall of 1983 he was selling to David Briscoe, Alan Koller and others. Kendrick continued to do business with Jones up until November of 1984. Kendrick was informed by Pfeister that during this time period George Wheeler was Pfeister's source of amphetamine/methamphetamine. David Coffey was a partner in Pfeister's drug business during this time period.

During the late fall of 1983 Kendrick was present at a meeting with "Butch" Suttinger and Sam Spurlock at the residence of Jones. Pfeister was also present and it appeared those individuals had obtained a chemical substance that they wanted refined. Kendrick was told that the substance was 43 pounds of unfinished amphetamine and Kendrick's assistance was requested in the final preparation of the product for distribution. Kendrick observed several ounces of yellow methamphetamine in the possession of Robert Crain, and Crain told Kendrick that he had obtained the yellow methamphetamine from Pfeister.

Kendrick introduced David Briscoe to Pfeister and arranged for Briscoe to obtain amphetamine on a fronted basis from Pfeister. Briscoe stored drugs for Kendrick in Briscoe's trailer and Pfeister made deliveries to Briscoe's trailer. By February of 1984 Pfeister would no longer sell directly to Briscoe and then Kendrick began fronting amphetamine to Briscoe. The fronted amphetamine came from Jones.

Briscoe got behind on his drug debt to Kendrick and Kendrick in turn did not pay Jones. Later Briscoe paid Kendrick for the drug debt with a pawn ticket for a gun that was valued at $250.00. Kendrick gave the pawn ticket to Jones. A few weeks later Jones gave Briscoe the pawn ticket and told Briscoe to go redeem the gun and bring the gun to Jones to satisfy the drug debt. However, Briscoe did not return with the gun.

Kendrick related the details of Jones' assault on Briscoe on the night of June 18, 1984.

During 1983 Kendrick paid approximately $60,000.00 to Jones for methamphetamine. In 1983 and the early part of 1984 Kendrick paid $65,000.00 to Pfeister for marijuana and $6,000.00 to $8,000.00 to Pfeister for methamphetamine. These amounts did not include the money he delivered from Jones to Pfeister in 1983.

On cross-examination Kendrick again related that Jones' assault on Briscoe concerned a drug debt which Briscoe had attempted to pay with a pawn ticket for a pistol. Kendrick further related that Pfeister had told him that George Wheeler was Pfeister's amphetamine source in 1983, along with George Cerra, aka Tattoo George, who was obtaining the amphetamine/methamphetamine from California.

*Testimony of Detective Rick Elmendorf*

Detective Rick Elmendorf of the Saline County Sheriff's department testified that he was called to the Kendrick residence on June 19, 1984 and observed David Briscoe in an unconscious state being removed from the residence with a massive head injury. Elmendorf identified photographs taken of the interior of the residence, which indicated Briscoe had been violently assaulted. The gun had apparently dis-

charged; a broken window had been discovered, along with a bullet fragment in the sill of the same window. A piece of scalp and hair was attached to the ceiling above the chair where the victim had been sitting.

### Testimony of David Briscoe

David Briscoe testified on behalf of the Government and stated that he had agreed to testify truthfully and in return, charges against him in this indictment were dismissed. Briscoe purchased methamphetamine and marijuana from Branch and Kendrick, beginning in January or February of 1983. At that time Kendrick told him that the source of the methamphetamine was Jones. Briscoe met Jones at the Kendrick residence during this time period. Briscoe also met Ralph Pfeister at the Kendrick residence when Kendrick had paid Pfeister for marijuana. In the summer of 1983 Briscoe lost his job and decided to make some easy money by selling drugs. In August of 1983 he met with Pfeister who fronted one-quarter ounce of methamphetamine to him for $400.00. Briscoe got behind in his payments to Pfeister and his debt to Pfeister for amphetamine rose to approximately $2,400.00 over a period of several months. In early 1984 Briscoe paid Pfeister off with a semi-automatic rifle and a motorcycle.

Later in 1984 Briscoe purchased methamphetamine from Kendrick and, due to his own drug habit, he got in debt to Kendrick. Briscoe provided Kendrick with a pawn ticket for a firearm to pay off part of the debt. Kendrick told Briscoe that the drugs that Kendrick sold to him were Jones' drugs and that Jones wanted the money so Kendrick passed the pawn ticket on to Jones. Briscoe met with Jones and Jones became very angry, gave the pawn ticket to Briscoe, and told him to go get the gun and bring the gun back to Jones. Briscoe kept the pawn ticket, embezzled some money from his job, and went to Florida, still owing Jones money for the drugs he had purchased from Kendrick.

Briscoe returned to the Little Rock area in May of 1984. On June 18, 1984, Briscoe was at Kendrick's residence when Jones arrived, assaulted him and beat him on the head with a gun. Briscoe was hospitalized for several weeks at the University of Arkansas Medical Center and underwent surgery twice to remove skull fragments from the wounded area. Briscoe confirmed that Branch had visited him in the hospital seeking information for Jones. Briscoe was in physical therapy for three months following the assault and now has partial paralysis in the right side of his body, principally in his right arm and leg.

Briscoe stated that he had been paid expenses for relocation by the Government because of the serious threats that he and his wife had received concerning his testimony in this case. On cross-examination Briscoe stated that he had received a phone call after this indictment stating that he would be killed if he testified. On cross-examination Briscoe testified that he had met George Wheeler in the company of Pfeister and that Wheeler was from Deer, Arkansas.

### Testimony of Michael Fagan

Michael Fagan testified that originally he had been indicted in this case but that later he was indicted separately, and pleaded guilty to reduced charges in return for cooperation and truthful testimony. Fagan made approximately fifteen marijuana purchases in one pound quantities at $800.00 to $1200.00 per pound from Pfeister during 1983 and 1984. Pfeister would, at times, front the marijuana to Fagan, coming by his residence and leaving the marijuana and then later coming by to pick up the money. On one occasion he was directed by Pfeister to pick up his marijuana at Jones' residence. He did pick up the marijuana at the Jones' residence and did not pay Jones but later paid Pfeister. Some of the marijuana was for his own use and some he resold to other people.

### Testimony of Coy White

The United States called Coy White as a witness. Coy White stated that he had

reached an agreement with the United States Attorney for the Western District of Arkansas wherein he agreed to plead guilty to the distribution of marijuana, agreed to testify truthfully, and agreed to cooperate in undercover investigations. In return for his cooperation he would not be charged with other acts in the Western District of Arkansas and would be provided with use immunity. Coy White stated that he also reached an agreement with the United States Attorney for the Eastern District of Arkansas to testify truthfully concerning Pfeister and, in return, White would not be prosecuted for his transactions with Pfeister in the Eastern District of Arkansas. On his plea of guilty in the Western District of Arkansas White received a sentence of three years.

His cooperation in the undercover investigation included wearing a body recording device and delivering chemicals. The investigation resulted in the indictment of several defendants in the Western District of Arkansas. This cooperation was pointed out to the court in the Western District at the time of White's sentencing.

Coy White had known Pfeister for approximately ten years, and first began dealing with Pfeister in February of 1984. He knew that Pfeister was dealing in amphetamine/methamphetamine and because of this he left Pfeister a sample that he had obtained from Tom Harding. In February or early March of 1984 Coy White sold approximately one ounce of amphetamine to Pfeister for approximately $1400.00. His sales to Pfeister increased to the point that he was selling as much as one-half pound at a time to Pfeister. Coy White estimated that he sold approximately three to four ounces per week to Pfeister for an eight month period in 1984. The price Coy White charged Pfeister dropped after Pfeister began purchasing larger amounts. Coy White estimated that he sold approximately one hundred ounces of amphetamine/methamphetamine to Pfeister during this eight-month time period and that Pfeister paid an estimated $100,000.00 for the drugs. This figure would include property, such as cars and motorcycles, which

he took from Pfeister on trade for amphetamine/methamphetamine.

Coy White was informed by Pfeister during this time period that Pfeister had other sources of amphetamine/methamphetamine and had, in fact, obtained one pound from someone else. Coy White also knew Ron Watson during this time period and sold to Ron Watson in 1984 in very small quantities only on several occasions. Coy White also sold cocaine to Pfeister in late 1984 and was paid approximately $2,000.00 to $3,000.00 for the cocaine. Coy White often fronted drugs to Pfeister.

Coy White and Pfeister both routinely cut their drugs. Coy White cut his drugs approximately eight grams per ounce, which would give a twenty percent reduction in purity. When asked the question if Pfeister cut his drugs another fifty percent, would that make the purity run around thirty percent, White responded that it would. It is significant to note that the amphetamine purchased on August 6, 1984 from Pfeister was stipulated to be amphetamine at 32 percent; it was stipulated that the amphetamine purchased on August 9, 1984 was amphetamine at 33 percent; it was stipulated that the amphetamine purchased on August 16, 1984 was 48 percent; and it was stipulated that the amphetamine purchased on September 17, 1984 from Pfeister was 38 percent.

Coy White said that Pfeister had a significant drug habit during this time period. Coy White further testified that Jimmy Dale White and Dwayne White were relatives of his and that he had been told in the fall of 1984 by Jimmy Dale White that Pfeister owed Jimmy Dale and Dwayne $10,000.00 for the purchase of marijuana. Coy White used the telephone to discuss his sales of amphetamine/methamphetamine with Pfeister and if Pfeister called and asked for "one" it would be a reference to a purchase of one ounce of methamphetamine. A telephone call from Coy White requesting something from Pfeister would concern money in payment for fronted methamphetamine. Coy White sold to

other persons besides Pfeister and sold a large quantity of drugs during this time period. Pfeister still owed Coy White approximately $10,000.00 for amphetamine/methamphetamine.

If Pfeister sold amphetamine/methamphetamine prior to early March or February of 1984 Pfeister had not obtained the drugs from Coy White. The reason he began selling to Pfeister was because he knew that Pfeister had been selling methamphetamine prior to February, 1984. If Pfeister sold marijuana, he had not obtained it from White.

### Testimony of Jerry Norvell

Jerry Norvell was called as a Government witness and testified that he had reached an agreement with the United States that in return for truthful testimony, his testimony would not be used against him.

Norvell had known Pfeister for approximately three years. In late 1983 and early 1984 Norvell began purchasing methamphetamine from Pfeister and continued purchasing from Pfeister for approximately nine months. The price was approximately $50.00 to $80.00 a gram and the price was set by Pfeister. Pfeister told him the price he should set on resale and that he should not sell for less than $100.00 per gram if he sold to other persons. As Norvell's purchases increased to several grams at a time Pfeister would front the amphetamine/methamphetamine to him and he would pay Pfeister later.

Norvell often used the telephone to discuss his drug transactions with Pfeister and Pfeister would send Heather McLaughlin or Maggie Swanson to Norvell's shop to pick up money for the drugs. Norvell used the amphetamine himself and also distributed it to two to five other persons. Pfeister delivered amphetamine to Norvell in the presence of Maggie Swanson and the two men used drugs in the presence of Maggie Swanson. Pfeister raised the price of the amphetamine when the quality improved.

In the summer of 1984 Norvell was not aware that his phone calls were being intercepted. He had reviewed transcripts of those phone calls and his references to "getting something to Ralph" were references to delivering money to Pfeister; the term for amphetamine would usually be a "half" or a "whole". The total amount Norvell paid Pfeister for amphetamine during this time period was approximately $2,000.00 and he also had purchased approximately $400.00 worth of marijuana.

Norvell also stated that the cycle shop was operated as a cycle shop and that motorcycles were worked on during early 1984, but by late 1984 little work was done as a cycle shop, and it appeared that people were just hanging around the shop. Norvell, still on cross-examination, admitted that he used drugs with Pfeister on several occasions and that he only sold to two people on two different occasions. On redirect Norvell stated that he was unsure of the number of people he sold to and it could have been as many as five; he also distributed small quantities to friends.

### Exhibits

The Government introduced numerous exhibits found in Jones' residence, some of which were cutting agents, residue of amphetamine and methamphetamine, bulletproof vests and t-shirts, one pound of marijuana and notes concerning the manufacture of amphetamine/methamphetamine. Items seized from Crain's residence included scales for weighing drugs, residue of methamphetamine and amphetamine, three items removed from the Koller residence, and a clipping from a Benton Courier newspaper article concerning the assault of David Briscoe.

Items seized from Kendrick's residence included scales used in weighing controlled substances and methamphetamine and amphetamine residue. Drug paraphernalia, pistols, amphetamine and a hand-written note from an individual known as "B.C." from Iowa were seized from Pfeister and his vehicle when he was arrested for driving under the influence in North Carolina.

Items seized during a search at Midway Cycle included a gross sales report showing legitimate income and income "received but not reported", a blue envelope addressed to Heather McLaughlin from Charles Suttinger, a blue phone index and telephone numbers and a check payable to Coy White signed by Pfeister.

Government Exhibits # 82 through # 95 were introduced and consisted of drug paraphernalia, amphetamine, WD–40 stash cans and a Hires Root Beer stash can. Government Exhibit # 85 was a sealed bag of phenyl acetic acid. Government's Exhibit # 89 was an envelope addressed to Michael Edward Jones with the return address of Charles Suttinger, containing 17 pages of step-by-step instructions for making amphetamine/methamphetamine. The remaining items were notebooks and papers seized from Pfeister's residence which indicate financial transactions with a number of co-conspirators in this case. The notebooks contained on-going, running totals of figures, some in thousands of dollars, to persons such as "Abe" (Michael Jones), "Coy" (Coy White), and others.

The United States next introduced Government's Exhibit # 96, a stipulation concerning the chemist's testimony that Government's Exhibit # 75 was in fact amphetamine. It was stipulated that the item was found on the person of Ralph Pfeister during his arrest in North Carolina in early 1985. Both exhibits were received at that time. The United States next introduced a stipulation concerning chemist's testimony in Government's exhibits # 26 through # 39. These exhibits were received in evidence, as were the remaining drug exhibits, which had been obtained in searches of the residences of Kendrick, Crain, Pfeister and Jones. It is significant to note that both methamphetamine and amphetamine were located in the residences of Jones, Crain and Kendrick.

### Testimony of Eugene Crouch

Eugene Crouch, Special Agent for the Federal Bureau of Investigation, testified that he prepared a chart from the tele-

phone records of Midway Cycle, Ralph M. Pfeister, Michael Edward Jones, Wally Kendrick and Robert Earl Crain. The chart reflected approximately 180 calls between Kendrick and Pfeister from January of 1983 to May of 1984. There were approximately 146 calls between Jones and Pfeister; there were 28 calls between Crain and Pfeister; and there were a number of calls from Pfeister to Michael Fagan, as well as to Charles Anthony Suttinger and David Briscoe.

Crouch further testified that Coy White's cooperation had resulted in the Government seizure of over $90,000.00 in property, including an eighteen-wheel tractor trailer truck, assorted cars and sports cars and an airplane.

### Testimony of Margaret Stevenson

Margaret Stevenson, an analyst for the Drug Enforcement Administration, was a well-qualified and very credible witness in this case. Her testimony revealed that the 17 page recipe found at the Pfeister residence, addressed to Michael Jones, was an in-depth recipe for the production of P2P or phenyl acetone, which is a precursor for methamphetamine. Stevenson testified that a precursor is a chemical which is necessary for the manufacture of a second chemical. P2P itself is a controlled substance, and is the chemical which is necessary for the final production of methamphetamine or amphetamine. She also testified that several pieces of paper which were found at Jones' residence contained a list of chemicals used in the production of P2P. The list was compiled from the 17-page recipe. Phenyl acetic acid, found at Pfeister's residence, was a substance used in an alternative method for making P2P. Stevenson stated that the use of phenyl acetic acid in the manufacture of P2P is the method of choice on the West Coast of the United States, while the 17-page recipe is the method of choice used in the southern United States.

It is significant to note that Wally Kendrick testified that George Cerra was obtaining amphetamine/methamphetamine

from a contact on the West Coast and that Cerra was at one time a source of drugs for Pfeister. It is also significant to note that Kendrick testified that he was at Jones' residence when Suttinger, Spurlock, Pfeister and Jones stated that they were in possession of 43 pounds of a substance which only needed a final step to make the substance methamphetamine. Stevenson stated that she had never seen a recipe which so completely described the process or detailed the steps involved in making P2P as the 17 page recipe.

Stevenson examined Government's Exhibit # 94, a Hires Root Beer stash can, and stated that she could smell phenyl acetic acid in the can. Stevenson reiterated that phenyl acetic acid is a precursor for P2P and that P2P is a precursor for amphetamine and methamphetamine. Stevenson examined glassware seized from Jones' residence and stated that it could have been used in several different processes during the manufacture of methamphetamine or amphetamine. She examined the vacuum pump and glass jar seized and stated that they could be used to dry out a powder substance in the manufacturing process of amphetamine/methamphetamine. She stated that the caustic soda mentioned in Government's Exhibit # 42 is an item that is commonly used in the final steps of the manufacture of methamphetamine and amphetamine. The United States introduced as exhibits diagrams utilized by Mrs. Stevenson during her direct testimony.

### Documents Introduced

Documents were introduced showing that neither Ralph M. Pfeister nor Michael E. Jones had filed tax returns for the years 1980, 1981, 1982, 1983 and 1984.

The original Western Union money transfer indicating that Charles A. Suttinger transferred $1,000.00 to Ralph Pfeister on June 15, 1984 was introduced as a Government Exhibit. Phone calls between Jones and Coffey indicates that Coffey told Jones Suttinger would be wiring cash to Pfeister. Kendrick testified that in 1983 Coffey was

a partner with Pfeister and transported marijuana for Pfeister.

Government Exhibits # 113 through # 118, the six boxes of original reel-to-reel tape recordings made during this investigation pursuant to orders of the District Court, were next introduced. The boxes were received in a sealed condition, a duplicate original having been provided to defense counsel for their inspection.

Government's exhibit # 119 was an evidentiary proposal wherein the parties agreed that the Government's Exhibits # 120 through # 216, individual cassette tapes, and Government's Exhibit # 120A through # 216A, corresponding transcripts, were fair and accurate reproductions and transcriptions as to the original Title III's in Government's Exhibits # 113 through # 118. The attorneys in the case, as well as the defendants, acknowledged that they had reviewed the transcripts and tapes; that these materials were accurate as to the original tapes and that the transcripts were fair and accurate representations of what was contained in the tapes. The parties further agreed in this document that the Court could review the transcripts of the tapes *in camera*. The parties agreed further that this review of the transcripts would be sufficient and in open court the Court reported all transcripts were read and considered as part of the record in this case.

### Intercepted Telephone Calls

The Government, in its post-trial brief, submitted a synopsis of the content of 97 intercepted phone calls between various individuals. Rather than reiterate the details of each call, the Court will merely summarize the essence of the calls as follows: The calls generally substantiate much of the testimony of Jack Branch, Lester Kendrick, Lloyd Chaney, Lonnie Staton, Richard Allen, David Briscoe, Jerry Norvell, Coy White and Michael Fagan.

The calls confirm the relationship between Pfeister and Jones with respect to drug dealings (i.e., discussions of money owed them); supervision or control over

numerous individuals, including the Delaneys, Kevin McDougal, Robert Crain, Heather McLaughlin, Tracy Wyatt, Maggie Swanson, Michael Fagan and Jerry Norvell; the continuing use of the terms "auto parts" and "hot rod parts"; the close conspiratorial relationship among Jones, Paul Delaney, Robert Crain and Gary Wiggs; substantial income received by Pfeister and Jones; Jones' hiding after his assault on Briscoe; that Jones regularly dealt in marijuana and that Pfeister dealt in large amounts of marijuana and supplied marijuana to Jones; that Pedro Martinez from Texas was one of Pfeister's sources of supply for controlled substances; that Coy White supplied Pfeister with amphetamine on a regular basis for nine months during 1984; that George Wheeler was another source for Pfeister; that Pfeister was trying to sell his motorcycle business in order to have working capital; that other persons were often used to assist in the drug transactions; Pfeister's drug habit; the financial relationship between Pfeister and Suttinger; the defendants control over the amount fronted; the ongoing financial relationship of Pfeister to Jones and Suttinger; Samuel Spurlock's involvement in the conspiracy; that Pfeister sold drugs to numerous people in the Harrison, Arkansas area; that Jimmy High had an ongoing relationship with Martinez and Pfeister to deliver controlled substances; that Suttinger acted at the direction of Pfeister in collecting money from Jones for Pfeister; Suttinger and Pfeister's financial relationship with Pedro Martinez; that Pfeister routinely cut his amphetamine by 50 percent; that Ron Watson was one of Pfeister's sources for amphetamine; that Eddie Schult was another individual who acted at the direction of Pfeister; that Pfeister was able to obtain other sources of controlled substances in large amounts; that Pfeister and Jones often used the term "part" to mean amphetamine; that Spurlock and McLaughlin were aware of and were part of the Pfeister drug organization; that Spurlock was sent to assist Pfeister in identifying any informant in his organization; that Spurlock was a drug dealer and that he left

drug sales in his home area to assist in the Arkansas organization.

### Testimony of Michael Jones

Michael Jones testified that Kendrick and Branch were his only two customers in 1983 and that he obtained methamphetamine from Kendrick from August 1983 until January 1984. This statement is not credible in light of all of the corroborated testimony indicated above. Also, Jones admitted he began selling drugs prior to 1983 and confirmed that he had a 1980 conviction for possession of methamphetamine.

Jones testified he had fronted, sold or distributed drugs to Wally Kendrick, Jack Branch, Alan Koller, Lonnie Staton, Robert Crain, Lloyd Chaney, Keith Smith, Art Downs, Georgianne Jones, Jeanine Maola, Kevin McDougal, Greg Wilkins and Homer Stone. Jones also stated that he had used drugs with Gary Wiggs, Phillip Goyne, Billy Jack Hathcock, James Stroud and William Edward Eaves. Jones admitted that his wife, Georgianne Jones, had brought methamphetamine to him from Pfeister and that he obtained some from an individual in Texas. Jones further admitted that Charles Suttinger and Samuel Spurlock did bring in a product which they wanted to turn into methamphetamine.

Jones denied receiving $60,000.00 from Kendrick, but rather stated it would only have been a third of that amount. Jones admitted that he had threatened to beat David Briscoe if he talked, but stated that he was not going to do so. Jones admitted he was a convicted felon and that during the investigation he had in his possession a .41 caliber pistol, a .45 caliber pistol, a .44 caliber pistol, and a .380 caliber pistol. He admitted that at one time he had a closed circuit T.V. in his house. He stated that the most he ever got into debt to Pfeister was $5,000.00.

Jones also admitted that he had told Lonnie Staton to quit selling to Alan Koller because Koller was already so far in debt to Jones. Jones confirmed that Michael Fagan at one time came to his house and picked up marijuana that had been left

there by Pfeister. Jones confirmed that he had received eight ounces of yellow methamphetamine from Pfeister and that on one occasion he had taken Robert Crain to meet Pfeister. He also admitted that Pfeister had put him on a cash on delivery basis when he purchased drugs. Jones had told Crain to send the Statons back to him if the Statons tried again to buy from Crain. Jones had used drugs with Judy Delaney and told Paul Delaney while he (Jones) was in hiding to take care of Jones' house and if anyone came by to pay Jones money to take it.

### Testimony of Ralph Pfeister

Ralph Pfeister also testified in his own defense. Throughout his testimony Pfeister discussed the numerous individuals to whom he sold, fronted and gave drugs, as well as from whom he received drugs. The people to whom he sold and/or fronted or gave various drugs were Ann Cotton, Maggie Swanson, Jennifer Harker, Charles Suttinger, Teresa Fiveash, Tracy Wyatt, Jack Branch, Jerry Norvell, Kevin McDougal, Jennie Teavis, Edgar Dovers, David Briscoe, Michael Fagan, Jimmy High and Michael Jones. He obtained marijuana from George Wheeler and Jimmy Dale White and methamphetamine from Mike Wheeler and George Cerra and cocaine from Coy White. Pfeister stated that Mike Wheeler had attempted to sell him a laboratory which was eventually sold to Tom and Joe Harding. He stated that in February, 1984 he began buying from Coy White.

Pfeister stated that he fronted drugs when drugs were fronted to him, and that if he had to pay cash, he made his customers pay cash. If Pfeister knew the individuals very well and knew that they would pay, the drugs would be fronted to them. No one picked up or delivered drugs for him. (This statement is contradicted by other evidence.)

Pfeister did not control Jones and believed that nobody could control Jones. Pfeister stopped selling to Wally Kendrick sometime in late 1983 because Kendrick got so far in debt to him. Pfeister person-

ally used as much as one-half ounce of methamphetamine per week, either giving it away or using it himself. He maintained his drug habit by selling methamphetamine. He stated that he still owed over $30,000.00 for drugs.

Pfeister admitted that Georgianne Jones had picked up amphetamine from him to deliver to Jones. He confirmed that he had not filed tax returns since 1980 because he was "just barely getting by." He admitted that he had sold drugs and had used the telephone to sell drugs, but stated that he had not engaged in a continuing criminal enterprise.

On cross examination Pfeister stated that he was using at least two ounces of methamphetamine a month and it would be a conservative estimate to say that he had spent $30,000.00 a year on drugs for personal use. He denied any knowledge of Eddie Schult having dealt with an individual by the name of Darlene Dew. Pfeister testified that he had attempted to purchase marijuana from Pedro Martinez but denied ever having purchased any controlled substances from Ron Watson. Pfeister stated that George Cerra was obtaining his drugs from California.

Pfeister said that a telephone conversation between him and Michael Jones concerning selling forty green T-shirts per month was a reference to selling forty pounds of marijuana. Pfeister admitted that he sold to Jack Branch on several occasions, and that he had told Branch that he would take care of Jones. Pfeister stated that he did not want to be cut-throat and that he did not want to do something behind Jones' back while Jones was on vacation. Pfeister admitted that he had told Branch that Jones had made $3,000.00 during the time Jones was on vacation due to sales to Jones' customers. Although Pfeister testified at trial that this statement was false, other evidence in the record discredits this trial testimony. Pfeister admitted that Jones was a close friend and that they shared their drugs from time to time. Pfeister had a key to Jones' house at one time. Pfeister stated that Jones was un-

concerned as to whether Pfeister would pay him on sales to Jones' customers but Jones was glad that Pfeister was honest.

Pfeister stated that a number of people in the area were suspicious of Jack and Rose Branch in the summer and fall of 1984 and that he had, in fact, talked to Ron Watson about it. Pfeister did not recall a telephone conversation between Pfeister and Suttinger where Suttinger offered to have someone come in and take care of Pfeister's problem. Pfeister admitted that the phone calls to Suttinger concerning "paint" did, in fact, concern cocaine. Pfeister stated that Jones had, in fact, given money to Charles Suttinger and that it might have been for drugs; he was not sure.

In reference to the telephone call from a person identified as "B.C." and a letter from that person, Pfeister stated that he was interested in what "B.C." proposed but that he could not obtain the substance that "B.C." wanted; he had no further information about "B.C." Pfeister did admit that he had a severe cash flow problem because of the amount of drugs that he had fronted to others and the fact that he was using so much himself. Pfeister put Jones on a C.O.D. basis by mutual agreement.

Pfeister admitted, after reviewing the transcripts on the calls on June 14, 15, 18 and 19 that he was aware that Jones had threatened to beat people who owed Jones money. During this time period Jones owed Pfeister drug money and Pfeister was attempting to collect it from Jones. Pfeister stated that Jones often made threats which Pfeister thought were idle threats. Pfeister did admit that he later learned that during the pertinent time period Jones had assaulted David Briscoe. Pfeister further admitted that he dealt with George Wheeler, Mike Wheeler and Jimmy Dale White on more than one occasion.

### I. Continuing Criminal Enterprise

In Count I the Grand Jury has charged Ralph Pfeister and Michael Jones with engaging in a continuing criminal enterprise under 21 U.S.C. § 848. The statute defines a continuing criminal enterprise as follows:

... a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this title or title III of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this title or title III

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

The Eighth Circuit Court of Appeals has recently set forth the elements for conviction under this statute in *United States v. Samuelson*, 697 F.2d 255 (8th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984). Generally, the statute requires proof of five elements in order to sustain a § 848 prosecution. First, the defendant's conduct must constitute a felony violation of federal narcotics law. 21 U.S.C. § 848(b)(1). Second, that conduct must take place as part of a continuing series of violations. 21 U.S.C. § 848(b)(2). Third, the defendant must undertake this activity in concert with five or more persons. 21 U.S.C. § 848(b)(2)(A). Fourth, the defendant must stand as an organizer, supervisor or manager of those five or more persons. 21 U.S.C. § 848(b)(2)(A). Fifth, the defendant must obtain substantial income or resources from this enterprise. 21 U.S.C. § 848(b)(2)(B).

The Court finds from the evidence and testimony presented that the Government has proved beyond a reasonable doubt every essential element of the offense charged. Accordingly the Court finds that defendants Jones and Pfeister were engaged in a continuing criminal enterprise and are guilty as charged in Count I.

### A. Felony Violations

■ In this case the indictment alleges the felony violations for each defendant in Count I. The indictment sets forth a number of substantive violations under Title 21, United States Code, Sections 841 and 843(b).[3] The defendants have also been charged with conspiracy to commit a felony in violation of 21 U.S.C. § 841. Furthermore, overt acts may be proven as part of a continuing criminal enterprise prosecution even if they have not been pleaded in the indictment as separate substantive offenses. *United States v. Becton,* 751 F.2d 250 (8th Cir.1984); *United States v. Middleton,* 673 F.2d 31, 33 (1st Cir.1982); *United States v. Bergdoll,* 412 F.Supp. 1308, 1318 (D.Del.1976).

■ The United States has proven numerous Title 21 felony violations committed by both of the defendants. Although already previously discussed in the statement of the facts, a comprehensive summary of the evidence, presented as Government's Exhibit "C" for Jones and Government Exhibit "D" for Pfeister, which the Court finds to be accurate, is attached hereto as Appendices "1" and "2". It is quite obvious that felony violations occurred for each defendant—i.e., sales and purchases of drugs between each defendant and numerous individuals and use of a communications and wire facility to assist in the drug business.

### B. Continuing Series of Violations

■ In defining the term "continuing" the Court in *United States v. Collier,* 358 F.Supp. 1351, 1355 (E.D.Mich.1973), *aff'd,* 493 F.2d 327 (6th Cir.1974), *cert. denied,* 419 U.S. 831, 95 S.Ct. 56, 42 L.Ed.2d 57 (1974), referred to the definitions in *Websters New World Dictionary* (2d Ed.1972)

and to *Black's Law Dictionary* (4th Ed. 1951) which define "continuing" as follows:

> To remain in existence or in effect; last; endure.
>
> Enduring; not terminated by a single act or fact; subsisting for a definite period or intended to cover or apply to successive similar obligations or occurrences.

The court in *Collier* looked also to *United States v. Midstate Horticultural Company,* 306 U.S. 161, 166, 59 S.Ct. 412, 414, 83 L.Ed. 563 (1939), which defined a "continuing offense" as "a continuous unlawful act or series of acts set foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."

As for the term "series," the court in *Collier* relied on a combination of dictionary definitions, common usage and state law to define "series" as "three or more related transactions." *Collier* 358 F.Supp. at 1355. Subsequent cases have adopted this definition and have required proof of three or more related violations in order to establish "a continuing series of violations" under 21 U.S.C. § 848(b)(2). The Eighth Circuit has recognized the "three or more rule". *Becton, supra,* 751 F.2d at 254.

The defense has argued that the evidence shows separate multiple sales by Pfeister and Jones which are not covered by this statute. To limit the continuing criminal enterprise statute to situations where there are multiple violations based on multiple events would limit the use of 21 U.S.C. § 848 to cases such as *Bergdoll, supra* and *Collier, supra.* A review of these cases shows just the opposite is true, in that these two cases extend continuing criminal enterprise prosecutions to short-lived single event cases rather than limiting it to such cases as the defense has suggested. Thus, the continuing criminal enterprise statute covers both single event oper-

---

3. The indictment alleges in Count I that from on or about January, 1983 and continuing thereafter up to and including the 21st day of February, 1985, Michael E. Jones, aka Abe, did knowingly and intentionally violate Title 21 U.S.C. §§ 841, 843(b) and 846 as set forth in Count II, Overt Acts 3, 4, 6, 7, 8, 9, 12, 13, 15, 17, 18, 20, 21, 24, 26, 27 and 42, and Counts II, III, IV, V,

VI, VII, IX, X, XXIII, XXIV and XXV of this indictment.

Ralph M. Pfeister, aka Peg, did knowingly and intentionally violate Title 21 U.S.C. §§ 841, 843(b) and 846 as set forth in Count II, Overt Acts 6, 17, 18, 21, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 41, 43, 44, 45 and 46 and Counts II, VII, XXIII, XXVI, XXVII and XXVIII.

ations such as one importation with several violations and extended drug distribution networks that span several districts and a long period of time. Such is the case with the Jones and Pfeister organization.

In *United States v. Fry,* 413 F.Supp. 1269, 1273 (E.D.Mich.1976), *aff'd,* 559 F.2d 1221 (6th Cir.1977), Judge Joiner, in addressing the continuity of a drug network stated that a continuing criminal enterprise by its nature involves a "series of acts" or "distinct parts" which may be "both temporally and spatially expansive." *Id.* at 1273. In *Fry* a defendant in California had sent numerous loads of marijuana into numerous other districts including the Eastern District of Michigan. The felony violations were the distributions and redistributions by co-conspirators in districts other than California which the defendant had knowingly set in motion. In the case at bar, Pfeister repeatedly sent amounts of controlled substances into the Eastern District of Arkansas for distribution and redistribution. Jones and Pfeister repeatedly and knowingly set those distributions and redistributions into motion.

Case law is clear that a continuing criminal enterprise prosecution is not limited to the same underlings, the same event or the same type of violation. It is well settled in this circuit, as well as others, that the five subordinates in the enterprise need not act in concert with each other or act at the same time. *United States v. Lewis,* 759 F.2d 1316, 1331 (8th Cir.1985); *Accord United States v. Phillips,* 664 F.2d 971, 1034 (5th Cir.1981), *cert. denied sub nom. Myers v. United States* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Barnes,* 604 F.2d 121, 157 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

Single event prosecutions are the exception, however, rather than the rule. An analysis of the major cases shows that the statute is directly designed for situations where a person sits in control of a large and varied distribution network. Such networks involve multiple distributions and redistributions such as in the instant case

against Jones and Pfeister. In *Fry, supra,* the prosecution involved multiple distributions of marijuana to various districts in the United States and later redistributions in those districts. In *Lewis, supra,* a defendant was found guilty of violating 21 U.S.C. § 848 because he was involved in transporting and selling marijuana, in selling and transporting cocaine, and in transporting money for such events. The *Lewis* court found that the evidence was sufficient because the defendant had been assisted by various people in these separate trips and sales. After *Lewis* one cannot argue that sales and trips to deliver and pick up money and drugs are separate just because they did not occur as part of a single event or offense. In *Lewis* the events were related to each other in that they showed the principal defendant in a series of separate acts. Such is the case with Pfeister and Jones.

Cases interpreting the continuing criminal enterprise statute rebut the defense argument that Pfeister's sales to Jones were somehow separate and unrelated events. The sales were related and there was an ongoing drug relationship between the two defendants.

Even under the most simple analysis, Jones and Pfeister committed a violation in a series of related violations in their respective drug distribution networks. A more complex analysis can also be made since Jones and Pfeister joined their ventures in 1983. The two jointly committed felony violations in a series of violations which involved five or more persons. In almost every event Jones and Pfeister mutually depended on each other. It has been established that various types of violations can be considered and that all of the parties need not act in concert with each other at the same time.

The running balances, the fronting of drugs on consignment, collections and crediting of accounts show the continuing nature of the violations.

The United States proved two closely intertwined and mutually dependent drug distribution networks that were massive in

terms of money, drugs and people. In a conservative estimate, the inference can be drawn that numerous people were involved in this case as suppliers, organizers, mid-level distributors, buyers and users. In view of the multiple violations heretofore indicated the record reflects beyond a reasonable doubt that Jones and Pfeister were both involved in drug distribution networks involving five or more people and that they were in a joint venture committing a series of violations involving five or more people.

### C. In Concert with Five or More Other Persons

### D. With Respect to Whom the Defendants Occupy a Position of Organizer, a Supervisory Position or Any Other Position of Management

In *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), the Court reasoned that "in concert" language required proof of an agreement between the defendant and each of five (or more) others identical to the kind of agreement necessary to establish a conspiracy. The Court concluded that conspiracy was a lesser included offense of § 848. This decision has had the effect of requiring proof of such agreements in all § 848 cases. As in proof of a conspiracy, an agreement may be demonstrated by direct evidence or it may be inferred from circumstantial evidence. Case law clearly indicates that the defendant need not act in concert with five or more others at the same time in order to violate § 848 or that the five persons act in concert with each other. *Phillips, supra,* 664 F.2d at 1034; *United States v. Mannino,* 635 F.2d 110 (2nd Cir.1980); *United States v. Barnes,* 604 F.2d 121, 157 (2nd Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Bolts,* 558 F.2d 316 (5th Cir.1977), *cert. denied sub nom. Hicks v. United States,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977), *United States v. Sperling,* 506 F.2d 1323, 1344 (2nd Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Nor do these five individuals have to act in concert in the same

state or district. *Lewis, supra.* The requirement of concerted action has not been narrowly prescribed in terms of time or place. *See Fry, supra.*

In addition to requiring that the defendant commit the violation "in concert with five or more other persons," § 848(b)(2)(A) requires that the defendant occupy "a position of organizer, a supervisory position, or any other position of management" with respect to these other persons. These additional elements have caused many to refer to § 848 as "the kingpin statute." Although Congress undoubtedly was targeting the kingpins of major drug rings when it enacted the continuing criminal enterprise statute, it by no means intended to limit its reach to one kingpin per drug ring. As the Court of Appeals for the Fourth Circuit stated in *United States v. Lurz,* 666 F.2d 69 (4th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982):

> The definition of the crime speaks in terms of "any person", § 848(a)(1), and of "a person", § 848(b). There is no indication that (the statute) can be applied to only one dominant participant in a conspiracy.

*Id.* at 80.

Congress did not intend that the government be required to prove that the defendant was the single ringleader. *Phillips, supra,* 664 F.2d at 1034. Since the language of the statute is in the disjunctive form, the government's burden is only to show that the defendant either organized, supervised or managed at least five other persons and not that he did all three. *Lewis, supra,* 759 F.2d at 1331. That the defendant "organized", "supervised" or "managed" may be proven by circumstantial evidence of conduct in accordance with the everyday meaning of those words. *United States v. Mannino,* 635 F.2d 110, 117 (2nd Cir.1980).

The Eighth Circuit has noted that the supervisory relationship specified in the continuing criminal enterprise statute need not have existed with regard to the five persons at the same time, that those five

persons need not have acted in concert, and that the same type of supervision need not have been exercised over each person. Furthermore, the supervisor does not have to have personal contact with each person. *Becton, supra,* 751 F.2d at 255. It was also held in *Becton* that it was not necessary that the defendant be the dominant manager. *Becton, supra,* 751 F.2d at 255. *See also Phillips, supra,* 664 F.2d at 1034.

The Eighth Circuit has held that the persons who transport controlled substances or money paid for controlled substances are sufficiently involved to be included in this portion of the statute. A person whose contact with the enterprise was "not intimate" but who served as a conduit to pass information and direction will also fall within the ambit of the statute. *Lewis, supra,* 759 F.2d at 1332.

The defendants argued that simply fronting drugs to another person for redistribution is not sufficient to be covered by the statute. When one person has five persons selling his drugs, he is within the reach of the statute due to the fact that he organizes between his sources of supplies and the persons willing to sell his drugs. This type of arrangement was found to fall within the statute in *United States v. Kirk,* 534 F.2d 1262, 1278 (8th Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977).

The evidence has shown that the defendants Jones and Pfeister did much more than simply sell drugs to persons whom they knew to be reselling. The defendants set the price and the amount to be sold. Jones and Pfeister provided drugs to their dealers on a consignment basis. Unless the dealer resold the substances, the principal would not benefit. The evidence has shown that Jones also controlled the amount a person could sell at any given time by limiting the amount he would allow out on consignment. Furthermore, the act of fronting drugs establishes a debtor-creditor relationship providing the creditor a basis for directing the debtor/distributors. A number of witnesses testified that Jones and Pfeister were able to dictate prices and quality as well as quantity. Jones collected his drug debts by threats, intimidation and assault. Pfeister knew that Jones intended to use any means necessary to collect money owed to Jones so that Jones could pay Pfeister. Jones stated that he would front only to those he had dealt with for a long time and then only a limited amount. Pfeister stated that he would front only if drugs were fronted to him and if he knew the distributor well enough to know that he would pay.

Appendices "1" and "2" to this opinion set out each person's participation and relationship to Jones and Pfeister and are supported by the testimony and evidence elicited at the trial. The evidence is overwhelming that Jones and Pfeister engaged in and committed felony violations as part of a series of violations in concert with five or more persons in which Jones and Pfeister stood in a position of organizer/supervisor or other position of management.

### E. Substantial Income or Resources

■ Judicial decisions construing the phrase "income or resources" have afforded the prosecution great latitude in establishing § 848 violations. In *United States v. Jeffers,* 532 F.2d 1101, 1116–17 (7th Cir. 1976), *aff'd in part, vacated in part on other grounds,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), the Court upheld the trial judge's instruction that substantial income "... does not necessarily mean net income ... [but] could mean gross receipts or gross income." The Court explained:

The courts have not taken the "substantial income" requirement as setting some definite amount of profits that must be proven to obtain a conviction for engaging in a continuing criminal enterprise. Nor do we think this would be a proper interpretation of the statute. The "substantial income" requirement should be interpreted as a guide to the magnitude of the criminal enterprise. Congress did not seek to punish small-time operators under this section. It sought to punish only those who obtained "substantial income or resources" from a continuing

series of drug violations. Certainly, this can be established by substantial gross receipts or substantial gross income as in [*United States v.*] *Sisca* [503 F.2d 1337 (2nd Cir.1974)] or [*United States v.*] *Manfredi* [488 F.2d 588 (2nd Cir.1973)]. Examined in this light, and keeping in mind the extreme difficulty in this conspiratorial, criminal area of finding hard evidence of net profits, the definition of income as "gross income or gross receipts" was entirely proper.

*Id.* at 1117.

The defendants argue that their lifestyles and inability to pay their bills preclude a finding of substantial income.[4] The Court disagrees. It has been held that a business can be carried on even though a profit is not realized. *United States v. Thomas,* 632 F.2d 837, 847 (10th Cir.1980), *cert. denied,* 449 U.S. 960, 101 S.Ct. 373, 66 L.Ed.2d 227 (1980). It has also been held that the defendant's inability to pay his bills was "not necessarily relevant to the question whether he obtained substantial income or resources from the criminal enterprise." *Bolts, supra* 558 F.2d at 321.

The United States attached a Summary Chart as Government's Exhibit "E" to its post trial brief which is attached hereto as Appendix "3". This exhibit shows that Jones received approximately $134,585.00 during the existence of the drug enterprise. The defense asserted that Jones was unable to pay his phone bill. That, however, is not significant because at the same time the defendant was operating a closed circuit television camera to conduct surveillance from outside his house. Furthermore, the $134,585.00 does not include the income Jones received from the fourteen other persons to whom he was distributing. Jones contends his failure to file tax returns indicates that he had no other legitimate source of income to support himself and because of little income he had several live-in house guests from 1980 to 1984 to help support him. Jones' drug enterprise

was not a small operation as the defense contended. Jones testified that Wally Kendrick had not paid him $60,000.00 but rather only one-third of that amount. Even if the Court were to use the defendant's figure, $20,000.00 in income from one individual is a substantial amount.

An intercepted phone call made by Judy Delaney shows that close associates considered Jones "wealthy" on account of his "deals". Branch stated that he observed thousands of dollars change hands between Pfeister and Jones. Furthermore, Jones told Branch that at one time he had four to five thousand dollars in drugs fronted out to dealers. The numerous phone calls by Jones to buyers, suppliers and distributors also show the extent of his drug network.

Jones testified that he sold drugs to support his habit. The use of drugs is a lavish personal expense and cannot be considered a legitimate expense to offset income.

The Jones distribution network was a large one which involved distributions to some twenty-three people. The evidence at trial showed more than half these people were distributing to others. The evidence proved beyond a reasonable doubt that Jones derived substantial income from a large drug-trafficking network which totaled hundreds of thousands of dollars.

Appendix "3" also details a summary of witnesses' testimony that Pfeister received approximately $143,550.00 from the enterprise. The testimony at trial was that in a nine month period Pfeister purchased some 100 ounces of amphetamine for approximately $100,000.00. Pfeister paid $1,000.00 per ounce for the amphetamine and resold it for $1,700.00 per ounce. The witnesses, tapes and chemical analyses establish that Pfeister routinely doubled the volume of the amphetamine he received by cutting it by 50 percent. By mathematical calculation, Pfeister's gross income would therefore be $340,000.00, less the $100,-000.00 he paid for the drugs, leaving a net income or profit of $240,000.00.

---

**4.** Jones lived in a rental house in a poor section of Little Rock, owned a 1970 Cadillac and a 1981 Harley Davidson motorcycle. Pfeister was living in a $75.00 a month rent house and owned a motorcycle and some cattle.

This calculation encompasses only nine months out of the two year period covered by the indictment and considers only one source out of nine active sources. Pfeister also dealt in large amounts of marijuana and testified that he owed $10,000.00 for marijuana that he had purchased from Jimmy Dale White. Pfeister testified that a conservative estimate of his own use of ampethamine would be $30,000.00. This personal expense cannot be considered as an offsetting deduction from his drug enterprise.

It does not matter what the defendant used his income to purchase but only that he had drug income at his disposal. A $30,000.00 personal expenditure constitutes substantial income. The figure of $143,-550.00 total income to Pfeister is incomplete in that it does not include the fourteen other persons to whom Pfeister distributed controlled substances. One important figure missing from the calculation is Pfeister's primary customer, Jones. Pfeister's failure to file tax returns was also introduced at trial to demonstrate that Pfeister had no legitimate income. Norvell testified that in 1983 Midway Cycle Shop was, in fact a cycle shop but that by 1984 it had ceased operation as a cycle shop. It is evident that Pfeister's business was obtaining controlled substances from ten active sources and distributing to at least twenty other distributors, buyers and users. It is clear beyond a reasonable doubt that Pfeister derived substantial income from this enterprise.

### Count II—Conspiracy

■ The United States has charged that Michael E. Jones and Ralph M. Pfeister, Charles Suttinger, Robert Crain, Lester Kendrick and eighteen other named persons were involved in a conspiracy which began in January of 1983 and ended in February of 1985. The conspiracy count alleges that Pfeister obtained methamphetamine, amphetamine, marijuana and cocaine for redistribution. This charge alleges that Jones would obtain the controlled substances from Pfeister and resell those substances to other persons.

The essential elements required to be proved by the Government in order to establish the offense of conspiracy are that the conspiracy described in the indictment was willfully formed and was existing at or about the time alleged, that the defendants willfully became a member of the conspiracy and that one of the conspirators thereafter knowingly committed at least one overt act which was knowingly done in furtherance of some object or purpose of the conspiracy. *United States v. Brown*, 584 F.2d 252 (8th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); Devitt and Blackmar, *Federal Jury Practice and Instruction* § 27.08 (3d Ed. 1977).

It is not necessary to reiterate the facts that support the conspiracy charge. The facts previously set out clearly show two closely intertwined and mutually dependent large-scale and on-going distribution networks between the various co-conspirators and both Jones and Pfeister. Appendices "1" and "2" show Jones and Pfeister's sources, customers, distributors and users. The Court finds that the Government proved beyond a reasonable doubt every essential element of the conspiracy charge.

### Distribution

■ In Counts 3, 4, 5, 6, 7, 9 and 10 Michael Jones is charged with the knowing and willful distribution of amphetamine and methamphetamine. The essential elements the Government must prove to convict on the distribution charge are that Michael Jones distributed methamphetamine and/or amphetamine and that he did so knowingly and intentionally.

The testimony and evidence presented at trial, a summary of which has previously been detailed in this opinion, leads the Court to conclude that the Government has proved beyond a reasonable doubt the essential elements of the distribution charge. Under the continuing criminal enterprise statute conspiracy is a lesser included offense of the continuing criminal enterprise

charge. *Garrett v. United States,* —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), however, held that the predicate offenses, such as importation or distribution, are not lesser included offenses of the continuing criminal enterprise charge. The Supreme Court concluded, therefore, that a court may impose separate punishments for the underlying substantive offenses and for the continuing criminal enterprise charge.

### Use of Communication Facility

■ The defendant Jones is charged in Counts 23, 24, and 25 with the unlawful use of a communication facility in facilitating the conspiracy alleged in Count 2. The defendant Pfeister is also charged in Count 23, and is further charged in Counts 26, 27 and 28 with the unlawful use of a communication facility in facilitating the conspiracy alleged in Count 2.

Specifically, in Count 23, Jones and Pfeister are charged with using the telephone illegally on or about June 14, 1984. Counts 24 and 25 refer to illegal use of the telephone by Jones on June 14, 1984 and June 19, 1984. Counts 26 and 27 refer to illegal use of the telephone by Pfeister on August 6, 1984 and October 6, 1984 and Count 28 refers to illegal use of a wire facility by Pfeister on June 15, 1984.

The essential elements the Government must prove in these counts are that the defendants knowingly and intentionally used a communication facility (telephone or wire service) to facilitate the commission of a felony under Title II or Title III.

Clearly the introduction of the intercepted phone calls previously referred to supports each of these charges. More specifically, on June 14, 1984 the defendants discuss the cash flow problem in their drug business and the fact that the lack of cash has them both in a bind. Pfeister states that he needs a couple hundred dollars to take care of a deal and Jones tells Pfeister that he has that much in his pocket. Jones promises that collections are going to start coming in. The two then discuss the quality of the "last two" that Pfeister sent to Jones. Jones states that the quality "is not quite up to what the rest has been" and that's what's slowing everything down. Pfeister states that he has some "fresh" coming, but he can't do anything until he and Jones get rid of what they've got. Jones then comments that "we've got too much ... inventory." Although there is no doubt from the conversation alone that Jones and Pfeister are discussing their drug business in furtherance of the conspiracy to possess with intent to distribute and to distribute amphetamine, Branch and Kendrick both testified at trial that Pfeister was a source of amphetamine for Jones. Branch also testified that during this time period Jones had two ounces of amphetamine that Jones wanted to sell as quickly as possible. Two ounces are also referred to in the telephone call involved in Count 24. Finally, at trial Jones testified that he purchased amphetamine from Pfeister and Pfeister admitted that he sold amphetamine to Jones.

On June 14, 1984, in a consensual phone call between Jack Branch and Michael Jones, Branch asked Jones if he still had "those two parts" Jones had told Branch about. Jones says he does. (Several trial witnesses, including Branch, testified that "parts" was a code word for amphetamine.) Branch states that he almost has the money for one and wants to work out something on the second. Jones replies that "the only thing that can be worked out is cold hard" (cash). Jones then states that he is going out to collect a bunch of money and that everybody who owes him a dime is going to be seeing him. The two agree that Branch will go to Jones' residence the next day to make the purchase. According to the trial testimony of Jack Branch and Detective Ronnie Burks, the following day, June 15, Branch went to Jones' house and purchased one ounce of methamphetamine. Thus, the use of the telephone by Jones on June 14 was in furtherance of the conspiracy to distribute methamphetamine.

On June 19, 1984, Jones talks to Paul Delaney and sets up a false alibi for the Briscoe assault. Jones tells Delaney that if anybody comes to Jones' house looking for

Jones, especially if the police do, Delaney is to tell the police that Jones left his house about midnight to get something to eat. Just prior to this call Jones had assaulted David Briscoe for Briscoe's failure to pay a drug debt. Thus, Jones used the telephone to direct Delaney to protect Jones and to prevent discovery of Jones' sale of drugs.

On August 6, 1984, in a call between Branch and Pfeister, Branch asks Pfeister if he can come up to see Pfeister and tells Pfeister that he "needs to get a part." (Again the code word for amphetamine.) Pfeister asks if Branch "wants to get a whole unit" meaning a whole ounce. The two then discuss price. Pfeister asks Branch how much Branch has been paying Jones for an ounce and tells Branch that he (Pfeister) has to take care of Jones on the sale. The two settle on $1700.00 for one ounce and Branch tells Pfeister he'll be coming to Midway Cycle Shop that evening. According to the trial testimony of Jack Branch and Detective Ronnie Burks, Branch then traveled from Little Rock to Midway Cycle Shop in Western Grove and purchased approximately one ounce of amphetamine from Ralph Pfeister. Thus, the use of the telephone by Pfeister on August 6 was in furtherance of the conspiracy to possess with the intent to distribute and to distribute amphetamine.

On October 6, 1984, Pfeister calls Michael Fagan to see if Fagan has received the marijuana Pfeister sent him. Pfeister also tells Fagan that he now has some better quality marijuana. Fagan testified at trial that he purchased a pound of marijuana from Pfeister over a period of approximately two years. The October 6 call was charged as Overt Act 43 in Count II and was in furtherance of Pfeister's drug enterprise.

In support of Count 28 a Western Union money transfer from Charles Suttinger to Ralph Pfeister in the amount of $1000.00 was introduced into evidence. Numerous intercepted telephone calls establish the drug relationship between Pfeister and Suttinger. In several of these calls Suttinger promises to send money to Pfeister for drug purchases and states that he will use Western Union to wire the money. Further, there is no evidence of any legitimate business dealings between the two men. Finally, at trial Pfeister admitted on cross-examination that he sold both marijuana and amphetamine to Suttinger. It is clear that the June 15 wire transfer of $1000.00 was payment from Suttinger to Pfeister for drug purchases and was in furtherance of the conspiracy charged in Count II.

These calls are also substantiated by the testimony of many of the Government's witnesses.

Counsel for the defendant Jones argues that the Court should apply Wharton's rule, and conclude that the conspiracy counts and phone counts should be absorbed into the deliveries. This is not the law. As indicated earlier, conspiracy is a lesser included offense of the continuing criminal enterprise charge. *Garrett, supra,* 105 S.Ct. at 2407, but the predicate offenses such as importation or distribution are not lesser included offenses. The Supreme Court has concluded that a court may impose separate punishments for the underlying substantive offenses and for the continuing criminal enterprise charge. *Id.*

In light of the evidence adduced the Court finds the Government has proved beyond a reasonable doubt every essential element necessary to convict Pfeister and Jones on each count charged under 21 U.S.C. § 843(b).

*Conclusion*

Counsel for Defendant Jones also used several pages to discuss the alleged bad faith on the part of the Government. Most of the allegations were raised by pretrial motions and resolved adversely to the defendants.

With respect to the allegation now raised in Jones' post trial brief that defendant was unable to call certain witnesses because of threats that they would lose prison privileges, defense counsel throughout the course of the trial never orally made

any such allegation nor filed any motion concerning such allegation.

The Court heard 23 taped conversations in open court and 97 tapes and their corresponding transcripts were made a part of the record. The Court has carefully reviewed and considered the transcripts of the taped conversations, the notes taken by the Court at trial and all of the exhibits introduced at trial, and concludes that the Government has clearly proved beyond reasonable doubt that the defendants Michael Jones and Ralph Pfeister committed all of the offenses charged in the indictment.