UNITED STATES of America, Appellee,

v.

Michael E. JONES, Appellant.

UNITED STATES of America, Appellee,

v.

Ralph Milton PFEISTER, Appellant.

Nos. 85-2351, 85-2441.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1986.

Decided Sept. 11, 1986.

Rehearing Denied Oct. 31, 1986
in No. 85-2441.

E. David Lewis, Little Rock, Ark., for appellant Jones.

Paul Johnson, Little Rock, Ark., for appellant Pfeister.

Terry L. Derden, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BATTEY,* District Judge.

HEANEY, Circuit Judge.

Michael E. Jones and Ralph M. Pfeister were convicted of narcotics violations which stemmed from an alleged conspiracy to sell amphetamines and cocaine in the State of Arkansas. Twenty-one others were also indicted; charges against them were disposed of through dismissals or guilty pleas to lesser offenses. After entering jury waivers, Jones and Pfeister were tried together to the court and convicted of: 1) conspiring to possess with the intent to distribute methamphetamine, amphetamine, and cocaine in violation of 21 U.S.C. § 846; 2) knowingly and willfully distributing amphetamine and methamphet-

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

amine in violation of 21 U.S.C. § 841(a)(1); 3) unlawfully using a communications facility in furtherance of a conspiracy in violation of 21 U.S.C. § 843(b); and 4) engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. Jones received a twenty-two year sentence and Pfeister received a twenty-year sentence.

On appeal, Jones and Pfeister claim the evidence was insufficient to sustain their CCE convictions. Jones alleges nine additional errors: 1) Wharton's Rule bars his conspiracy conviction; 2) the evidence was insufficient to sustain the unlawful use of communications facility conviction; 3) the motion to recuse the magistrate who executed the wiretap orders and search warrants should have been granted; 4) the motion to have the informants interviewed by defense counsel should have been granted; 5) the motion to suppress items seized at the execution of the search warrant should have been granted; 6) the fruits of the electronic wiretap should have been suppressed; 7) the court should have suppressed statements made by the defendants to a confidential informant; 8) the district court's application of the Criminal Justice Act violated Jones' sixth amendment right to counsel; and 9) the district court improperly admitted evidence of two assaults. Pfeister alleges one additional error: the indictment should have been dismissed because his right to a speedy trial was violated. We address each issue in turn.

## I. CONTINUING CRIMINAL ENTERPRISE.

Jones and Pfeister contend that the evidence was insufficient to sustain their convictions under the CCE statute. In examining this contention, we view the evidence in the light most favorable to the government to determine whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original). Section 848 comprises five essential elements:

1) a felony violation of the federal narcotics laws;

2) as part of a continuing series of violations;

3) in concert with five or more persons;

4) for whom the defendant is an organizer or supervisor;

5) from which he derives substantial income or resources.

*United States v. Lewis,* 759 F.2d 1316, 1331 (8th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985) (citations omitted).

For reversal, Jones and Pfeister argue that the government did not prove that their drug sales were part of a continuing series of violations, that they organized a group of people, or that they derived substantial income from selling drugs.

### A. Continuing Series of Violations.

■ "Continuing" requires that the course of illicit conduct span a definite period of time, and a "series" is established by proof of three or more related violations. *United States v. Bergdoll,* 412 F.Supp. 1308, 1317 (D.Del.1976). *See United States v. Becton,* 751 F.2d 250, 254 (8th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985).

■ Jones and Pfeister argue that the evidence shows only that they consummated separate unrelated drug sales which are not covered by the CCE statute. We are not convinced. A careful examination of the record reveals that during the time frame of the indictment—January, 1983, to February 19, 1985—Jones and Pfeister were major suppliers in a large and active narcotics distribution network.

At least seven witnesses testified to purchasing drugs from Jones during 1983. Jack Branch testified that he had an ongoing relationship with Jones and purchased one ounce of methamphetamine per week during the course of the indictment. Lester Kendrick testified that he gave Jones $60,000 for amphetamines and marijuana during 1983, in various increments, for a

series of sales. These sellers, who were working for Jones, were cognizant of the organization they were a part of and knew they could get more drugs from Jones at any time.

Pfeister had an ongoing relationship with Jones and was Jones's primary supplier during the indictment period. Kendrick testified that he paid Pfeister at least $65,000 for marijuana in various increments during 1983 and 1984. It is clear that both Jones' and Pfeisters' drug sales were part of a continuing series of violations as contemplated by the CCE statute.

### B. Organized, Supervised, or Managed at Least Five Other Persons.

 The supervisory relationship specified in the CCE statute need not have existed with regard to the five persons at the same time, those five persons need not have acted in concert, and the same type of supervision need not have been exercised over each person. *Becton*, 751 F.2d at 254–55. The accused must, however, occupy a "sufficiently central role to be regarded as holding 'a position of organizer, a supervisory position or any other position of management.'" The five others must participate in such a way so that they could be said to have fallen under the accused's managerial authority. *United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir.1985). Furthermore, the government need not prove that the supervisor had personal contact with each person. *United States v. Dickey*, 736 F.2d 571, 587 (10th Cir.1984), *cert. denied, sub nom., Friedrich v. U.S.*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

 Jones and Pfeister acknowledge that they "fronted," or sold on credit, drugs to five or more persons. They argue, however, that simply fronting drugs to five or more persons does not amount to controlling those persons and thus cannot support their conviction under the CCE statute. We agree with that contention. At oral argument before this Court, the government acknowledged that evidence of fronting drugs, without more, would be insufficient proof to support the "control"

element of the CCE statute. However, as the government pointed out and our own review of the record revealed, the proof against Jones and Pfeister on this point was substantially more than simply that they fronted drugs.

The record reveals that Jones and Pfeister were closely aligned in this drug network. Although Pfeister sold Jones drugs and thus was one step up in the chain of distribution, theirs was a cooperative relationship. They conferred over payments, inventory, and quality of the drugs. Kendrick shuttled drugs and money between Jones and Pfeister at least fifteen times. Pfeister gave Jones a percentage of sales he made to Jones's customers. Further, Branch testified that Jones told him that he owned one-third of the Harrison, Arkansas, drug operation along with Pfeister and George Wheeler. However, we are not prepared to say that Jones and Pfeister were partners, and thus Jones cannot be convicted on the basis of testimony against Pfeister and vice versa. Nevertheless, we find sufficient evidence in the record indicating that Jones controlled at least five persons and that Pfeister controlled at least five other persons.

#### 1. *Jones.*

Jones controlled, at the very least, the following six individuals: 1) Jack Branch, 2) Bobbie Staton, 3) Lonnie Staton, 4) David Briscoe, 5) Allan Koller, and 6) Wally Kendrick. Jones asserted a possessory interest in at least three of those individuals as *his* customers. Branch testified: "I could go other places [for drugs] as long as he [Jones] knew where I was going." Kendrick testified that he had to pay an extra $100 for drug purchases from Pfeister, to be paid to Jones, because Kendrick was a Jones customer: "If you bought from him [Pfeister] and you was from Little Rock, you paid an extra hundred dollars [to Jones]." Lonnie and Bobbie Staton temporarily purchased drugs from an alternate source after having established themselves as Jones customers. When Jones learned of this purchasing arrangement, he went to

the new source's home and beat him up with a pistol. As Bobbie Staton testified: "He was put out of business real quick."

Additionally, the evidence reveals that Jones used physical force, or threatened its use, to encourage his "sellers" to promptly pay him. And, he kept track of when his sellers were scheduled to be paid by their customers so that he knew just when to attempt collection. Briscoe testified that he purchased drugs from Kendrick and exceeded his credit line. When Briscoe couldn't pay Kendrick, Kendrick told him Jones wanted to talk to him, that the fronted drugs were Jones's drugs, and that he "owed" Jones. Briscoe agreed to go and talk to Jones. Briscoe testified that "he [Jones] said 'It's you, Briscoe. It's always you.' He got real mad, pointed his finger at me, and he said, 'You get the money.'" Briscoe later made only a partial payment, so Jones beat Briscoe to the extent that two brain surgeries were necessary to remove bone fragments. Koller testified that Jones threatened him over the phone and visited his house to tell him that "It's almost too late." Additional methods Jones employed to "control" his customers included: 1) instructing them as to the language they could use to refer to drugs over the telephone, 2) setting the prices for the drugs, 3) dictating whether the sales would be cash or credit, and 4) telling them who they in turn could sell the drugs to.

## 2. *Pfeister.*

Pfeister controlled or supervised at least the following five persons: 1) Jones, 2) Heather McLaughlin, 3) Margaret Swanson Pfeister, 4) Jerry Norvell, and 5) Michael Fagan. Pfeister directed Jones as to the quality and permissible dilution ratio of the drugs Jones was selling. Branch testified: "I told him [Pfeister] that the quality was up from what I had been getting from Abe [Jones] and he said that he had had a talk with Abe about the quality of his drugs, about cutting his drugs so much[.]"

Pfeister's secretary, Heather McLaughlin, served him in a number of different ways. She collected money from Norvell and from Jones. She was a conduit for Pfeister and continually passed information both from and to him.

Margaret Swanson Pfeister also served under Pfeister. Several of the intercepted telephone conversations reveal that she knew all about the drug operation and that she took orders directly from Pfeister. There are several phone conversations during which Pfeister directs her to bring an item out of the stash can and to tell him how many packets are in the can. She clearly helped Pfeister in his drug business.

Jerry Norvell testified that Pfeister determined the quantity of drugs Norvell purchased from him and set the purchase price.

Q: Who decided when you would get more drugs?

A: Well, just from time to time, you know, Ralph would come by and have some with him and I would buy some.

\* \* \* \* \* \*

As the quality got better he said, "This is good. You need to get more money."

Michael Fagan testified that Pfeister dropped a pound of marijuana every month or so at Fagan's house. Fagan would then sell the drugs and later pay Pfeister. Pfeister visited Fagan, periodically, to see if he needed more of the drug. On at least one occasion, Pfeister directed Fagan to pick up the marijuana from Jones's house because he wasn't able to stop by.

After examining cases from our Circuit as well as others, we are convinced that the evidence we have discussed is sufficient to support the "controlling five or more persons" element of the CCE statute.

In *United States v. Becton,* 751 F.2d at 253–55, the evidence that Becton controlled five or more persons included: 1) Becton's selling enormous quantities of marijuana to several witnesses; 2) one witness's testimony to assisting Becton in weighing a truckload of marijuana, which he subsequently delivered to three different locations at Becton's direction; 3) Becton's arranging the distribution of a large quantity (7,000 pounds) of marijuana; 4) Becton's arrang-

ing to have his relatives participate in smuggling activities.

In *United States v. Samuelson*, the evidence that Samuelson occupied a position of management and supervision was that "[h]e negotiated the sales of large quantities of drugs, made arrangements for payment and delivery, instructed the participants in the transactions, and perhaps furnished those who were arrested with bonds and attorneys. 697 F.2d 255, 259 (8th Cir. 1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984).

In *United States v. Dickey*, 736 F.2d 571, 587–88 (10th Cir.1984), *cert. denied, sub nom., Friedrich v. U.S.*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985), evidence of control comprised: 1) setting up the meeting place for two drug transactions, 2) directing subordinates where to pick up the fronted drugs, and 3) directing one of his buyers how and what amount to collect from someone that person would sell to.

The case against Jones and Pfeister is replete with evidence that they controlled their underlings in the drug network they established. Thus, this element of the CCE statute is supported by sufficient evidence.

### C. Substantial Income or Resources.

■ Finally, Jones and Pfeister argue that there was no evidence in the record to support a finding that they derived substantial income from selling drugs. They argue that their lifestyles preclude a finding of "substantial income" because the statute was designed to reach "Mafia-type Godfathers" not "Arkansas residents living in rented houses and riding old motorcycles." (Appellants' Brief p. 41). We find no merit in this argument.

The CCE statute does not prescribe the minimum amount of money required to constitute "substantial" income. Judicial decisions construing this phrase have given the prosecution great latitude on this point.

In *United States v. Jeffers*, 532 F.2d 1101, 1116–17 (7th Cir.1976), the Court upheld the trial judge's instruction that substantial income "does not necessarily mean net income * * * [but] could mean gross receipts or gross income." The Court went on to state that

[t]he courts have not taken the "substantial income" requirement as setting some definite amount of profits that must be proven to obtain a conviction for engaging in a continuing criminal enterprise. * * * The "substantial income" requirement should be interpreted as a guide to the magnitude of the criminal enterprise. Congress did not seek to punish small-time operators under this section. It sought to punish only those who obtained "substantial income or resources" from a continuing series of violations.

*Jeffers*, 532 F.2d at 1117.

In *United States v. Sisca*, 503 F.2d 1337, 1346 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974), the Court looked to: 1) evidence of the defendant's position in the drug network; 2) the quantity of narcotics involved; and 3) the amount of money that changed hands. In *United States v. Kirk*, 534 F.2d 1262, 1278 (8th Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977), the substantial income element was met because the defendant "dealt with sufficient money to be able to send agents to New York and California to buy heroin."

Here, evidence presented at trial reveals that Jones received nearly $150,000 for drugs he sold during the period of the indictment. Moreover, in a recorded conversation, Jones told Branch that his drug business was a full-time occupation: "[N]ow I'm so * * * busy taking care of this * * * I ain't got time to do nothing else. Can't even work on my * * * motorcycle."

Coy White, one of Pfeister's sources, testified that during one nine-month period, White sold Pfeister 100 ounces of amphetamine for $1,200 per ounce. A conservative estimate is that Pfeister resold it for $1,600 per ounce after cutting it by fifty percent. Several witnesses testified that Pfeister usually doubled the volume of amphetamine he purchased by cutting it fifty

percent. Thus Pfeister made at least $200,000 on that single 100–ounce purchase. Kendrick testified that during 1983, he paid Pfeister $65,000 for marijuana. Fagan testified that he paid Pfeister approximately $1,000 per pound on fifteen different occasions for marijuana. It is clear that both Jones and Pfeister derived substantial income from their enterprise.

## II.

■ Jones contends that Wharton's Rule prohibits his conviction on both the conspiracy and substantive narcotics counts, claiming "the conspiracy and telephone counts were absorbed in the delivery." Wharton's Rule provides:

An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.

1 Anderson, Wharton's Criminal Law and Procedure § 89 p. 191 (1957).

Essentially, Jones is arguing that he cannot be prosecuted for conspiring to distribute drugs since the cooperation of both parties was essential to complete the substantive offense. We disagree. Wharton's Rule will not bar a conviction where more persons than are necessary to complete the substantive offense are involved in the conspiracy. *United States v. Bommarito*, 524 F.2d 140, 144 (2d Cir.1975). While only two persons are necessary for the substantive offense, it is clear from the record that more than two persons were involved in the conspiracy to distribute drugs. Moreover, Wharton's Rule is a limited "exception to the general principle that a conspiracy and the substantive offense that is its immediate end do not merge upon proof of the latter," and it "has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary." *Bommarito*, 524 F.2d at 143, quoting *Iannelli v. United States*, 420 U.S. 770, 782, 95 S.Ct. 1284, 1292, 43 L.Ed.2d 616, 625 (1975).

Finally, at least one case has held that Congress did not intend Wharton's Rule to be applicable to section 846:

Section 406 of the Act, 21 U.S.C. § 846, supplements the general federal conspiracy statute, and makes it a crime to conspire "to commit *any* offense defined in this subchapter." (Emphasis added). The all-inclusive language of § 846 is not accidental but rather is consistent with the Act's overall aim of strengthening remedies available against organized traffic in drugs while lessening penalties for possession of drugs for personal use. See H.R.Rep. 91–1444, 91st Cong., 2d Sess., pt. 1, 10–11 (1970), U.S.Code Cong. & Admin.News, 1970, p. 4566. Allowing prosecution for conspiracy under § 846 without the limitations imposed by Wharton's Rule is warranted by the Act's expressed purposes of "providing more effective means for law enforcement aspects of drug abuse prevention and control" and "providing for an overall balanced scheme of criminal penalties for offenses involving drugs." *Id.* at 1, U.S. Code Cong. & Admin.News, 1970, p. 4567. In view of Congress' obvious concern with the dangers posed by organized schemes to distribute drugs, and the careful consideration it gave to the Act's scheme of penalties, we believe that if it had intended to restrict the scope of § 846 through the application of Wharton's Rule, it would have done so explicitly.

*Bommarito*, 524 F.2d at 144 (footnote omitted).

## III.

■ Jones next contests the sufficiency of the evidence to support his conviction of unlawfully using a communications facility. Jones was convicted in counts twenty-three, twenty-four, and twenty-five of the unlawful use of the telephone to further the conspiracy alleged in Count Two.

Count twenty-three charged both Jones and Pfeister with the unlawful use of the telephone on June 14, 1984. In support of that charge, the government introduced an eight-page transcript of an intercepted

phone call between Jones and Pfeister. During the conversation, Jones and Pfeister discussed the cash flow problems inherent in their drug business: "Now I've gotta have a couple hundred dollars to go take care of this deal;" the quality of the drugs: "This last * * * is not quite up to what the rest has been;" and their overabundance of inventory:

Pfeister: "I've gotta, I got some fresh, you know, some fresh coming and stuff, but * * * can't do nothing."

Jones: "No, gotta get rid of what we got, we got too much, uh."

Pfeister: "Yea."

Jones: "Inventory."

It is clear that this conversation furthered their drug business.

Count twenty-four is supported by an intercepted phone call between Jack Branch and Jones during which they discuss a potential sale of amphetamine from Jones to Branch:

Branch: "Uh, listen you still got those two parts you were telling me about."

Jones: "Yeah."

Branch: "Okay. I've got everything in order for, you know, for one. Hello."

Jones: "Okay."

Branch: "And I would kind a like to work something out on the second one."

Jones: "The only thing that can be worked out is cold hard [cash]."

Branch: "Is that right?"

Jones: "Same way as the first one."

Branch: "Well, I, well I might have everything, you know, in order, you know, in the morning. Uh but, you know, but I don't know about for both of them. Is uh there uh maybe is there was some way I could get a better price."

Jones: "No better."

According to the testimony of Branch and Detective Ronnie Burks, the following day, June 15, Branch went to Jones's house and purchased one ounce of methamphetamine. Thus the use of the telephone was in furtherance of the conspiracy to distribute controlled substances, and such substances were purchased.

Count twenty-five is based on an intercepted conversation between Jones and Paul Delaney on June 19, 1984. During the conversation, Delaney agreed to set up a false alibi for Jones as to where he was when Brisco was assaulted.

Jones: "If anybody comes over there looking for me."

Delaney: "Yea."

Jones: "Especially the police or anybody."

Delaney: "Uh, huh."

Jones: "I left there about 12 o'clock."

Just prior to this call, Jones had assaulted Briscoe for Briscoe's failure to pay a drug debt. Both Briscoe and Kendrick testified that Jones had beaten Briscoe for nonpayment of a drug debt. Thus, Jones used the phone in furtherance of the conspiracy because he used it to direct Delaney to protect Jones to prevent discovery of Jones's sale of drugs and collection efforts.

**IV.**

█ Jones's next contention is that the district court erred in denying his motion to recuse any judicial officer executing any of the wiretap orders or search warrants in this case. Jones sought recusal on the ground that the suppression of evidence obtained from the warrant or wiretap would require the judge's initial decision to be overruled.

Twenty-eight U.S.C. §§ 144 and 455 govern the disqualification of judges. Under both sections 144 and 455, the moving party is required to show personal bias or prejudice on the part of the presiding judge. *McChristion v. Hood,* 551 F.Supp. 1001, 1003 (N.D.Ind.1982). To be disqualifying, the judge's bias or prejudice must stem from an extrajudicial source. *United States v. Faul,* 748 F.2d 1204, 1211 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985). At no time during the course of this proceeding did Jones show any specific facts indicating personal bias on the part of any judicial officer. This motion was properly denied.

## V.

Jones's next point is that the motion to have the informants interviewed by defense counsel should have been granted. His argument in support of this point consists of only the following sentence: "To allow the government to secrete the principal witnesses so that defense counsel could not find them and interview them deprived defendants of a fair trial."

We find no evidence in the record indicating that the government "secreted" the informants Jack Branch, Rose Branch, and Steve Bonds. The United States Attorney's Office had agreed to accept service of process for each of these three persons. Neither appellant's brief nor the record indicates that the appellants even *attempted* to subpoena the informants. Therefore, we can only conclude that they were not prejudiced due to the court's denial of their motion to have the informants interviewed. *See United States v. Coronel–Quintana*, 752 F.2d 1284, 1288 (8th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

## VI.

Jones raises six issues as to why the motion to suppress items seized at the execution of the search warrant should have been granted. First, he claims the United States exceeded the warrant: 1) by having news people "searching" rather than only "any special agent of the U.S. Department of Justice or duly authorized officer;" 2) by searching motor vehicles on the Jones' premises; and 3) by viewing all the videotapes on the premises.

The record does not support Jones's allegations that the government gave advance notice to the media of the times and places to be searched. Further, the government did not seek to introduce any evidence seized from any vehicles at the Jones' residence, nor did it attempt to introduce any videotapes at trial. Jones also alleges that items seized, specifically the "Bandido" memorabilia, were outside of the scope of the warrant. The government had planned to introduce evidence that Jones and Pfeister used their membership in the Bandido motorcycle club to distribute controlled substances; thus, indicia of the membership was pertinent to the charge. *United States v. Haley*, 452 F.2d 391, 397 (8th Cir.1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972). This evidence was not introduced at trial because all of the codefendants pled guilty. Further, Jones does not allege that the government bolstered its case in any way with the evidence it discovered either in the vehicles or on the videotape, nor does the record reveal this to be the case. Thus, we can only conclude that any error was not prejudicial.

Second, Jones claims the warrant itself was over broad. Jones claims that the word "paraphernalia" should not have been used and that other language made the warrant a general warrant. General warrants are, of course, prohibited by the fourth amendment. "[T]he problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. * * * [The fourth amendment] requir[es] a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The challenged word, "Paraphernalia," is specifically restricted in the warrant to "paraphernalia for packaging, cutting, weighing, and distributing controlled substances[.]" The warrant specifically sets out four other categories of items to be seized: 1) papers relating to ordering, purchasing, and distributing controlled substances; 2) addresses and telephone books; 3) controlled substances; and 4) material evidence of occupancy and any and all other evidence of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 848. Thus, the warrant was sufficiently specific.

Third, Jones attacks the validity of the affidavit for its failure to identify all prior bad acts of the informant. The informant's credibility was demonstrated by consensually monitored conversations, chemical analysis, and extensive police monitoring. The magistrate was presented

with specific facts to find the informant reliable.

■ Fourth, Jones attacks the affidavit as being stale because the information contained in the affidavit was seven months old. The passage of time between the transactions on which a warrant is based and the ensuing search is less significant when the facts recited indicate activity of a continuous nature. *United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir.1973); *Andresen v. Maryland,* 427 U.S. 463, 477 n. 9, 96 S.Ct. 2737, 2747 n. 9, 49 L.Ed.2d 627 (1976). Here, the defendants were charged with the crime of engaging in a continuing criminal enterprise. The very nature of the charge suggests ongoing offenses. Thus, the information supporting the affidavit was sufficient to support probable cause. The fact that seven months passed between the transaction and the warrant is not significant due to the protracted nature of this drug case.

Fifth, Jones attacks the affidavit upon which the search was based on the ground of multiple hearsay because the affidavit relies on information from other police officers, whose reliability was not established and who were relaying information from the informant. Information from "fellow officers of the Government engaged in a common investigation [is] plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) (footnote omitted).

Finally, Jones attacks the affidavits insofar as they were based on the informant's testimony. His claim is that all statements obtained by the informant after the wiretap order had been issued should be suppressed as there was then a judicial proceeding against the defendant, and he was the focus of a criminal case and his *Miranda* rights attached. This argument is without merit. *See* section VIII of this opinion.

## VII.

Jones asserts five grounds for suppressing evidence gleaned from the wiretaps. All alleged errors are violations of 18 U.S.C. § 2518. The allegations are: 1) improper use of hearsay; 2) improper limitation of the wiretap orders; 3) insufficient employment of alternative investigative techniques; 4) lack of mimimization; and 5) improper extensions.

First, Jones attacks the validity of the affidavits presented to the district court judges in support of the wiretapping applications on the ground that they contain hearsay. Jones's complaint seems to be that because the affiant relied on information told to the affiant by other police officers rather than information gleaned from listening to the informant's tapes, the affidavits were defective. This argument is unconvincing. "Where, as here, there is a substantial basis for crediting the hearsay, it will not vitiate the finding of probable cause." *United States v. Agrusa,* 541 F.2d 690, 694 (8th Cir.1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977).

Jones's second complaint is that the wiretap orders were not properly limited as to person, time, and place. The June 13, 1984, wiretap order authorized interceptions on Jones's phone. The period of surveillance was June 13, 1984, through July 9, 1984. The application and order identified the subject and did not exceed thirty days; thus, it was properly limited in terms of person, time, and place.

■ Jones next contends that the government presented insufficient information indicating that other investigative techniques were tried and failed, as required by 18 U.S.C. § 2518(3)(c). Judicial officers may authorize interception of wire communications if they find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Thus, a wiretap should be necessary and reasonable; however, investigators need not exhaust specific or all possible investigative techniques before a court can issue a wiretap order. *United States v. Garcia,* 785 F.2d 214, 223 (8th Cir.1986). Here, the affidavits set

forth that use of informants, toll records, and physical surveillance had all been tried with little success in identifying and defining the roles of coconspirators. The affiant also set forth facts concerning how these techniques had worked in this case and the dangers inherent in some techniques. After reviewing the record, we are satisfied that this subsection of 18 U.S.C. § 2518 was complied with.

■ The next argument is that the agents failed to minimize the wiretap by limiting their intrusion into unrelated conversations as required by 18 U.S.C. § 2518(5). The district court, after benefit of a hearing, determined: "Due to the nature of the charges involved in this investigation, the number of people involved in the conspiracy, and the use of code words by the defendants, the court finds that a good-faith effort was made to minimize both incoming and outgoing calls in this case." This finding is not clearly erroneous.

■ Finally, we hold that the extension of the wiretap order was proper and complies with 18 U.S.C. § 2518(5). The use of code words and the broad and extensive scope of a conspiracy are relevant factors to determine whether an extension is justified. *See United States v. Daly*, 535 F.2d 434, 439 (8th Cir.1976).

## VIII.

The next issue is whether the statements Jones made to the confidential informant should have been suppressed because: 1) he was not given *Miranda* warnings; and 2) no warrant was obtained.

■ Jones asserts that with the wiretap order, a judicial proceeding began against him necessitating *Miranda* warnings prior to any further communication with him. His theory is that the informant is a government agent and should have given Jones *Miranda* warnings prior to speaking to him. This argument is without merit. A wiretap is only an investigative technique employed to help gather enough information to begin a judicial proceeding against an individual. *Miranda* warnings are only required to be given when a suspect is placed under arrest, is in custody, or has his freedom restricted in a significant manner, and is subjected to interrogation or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Thus, mere focus of an investigation on an individual, without more, is insufficient to trigger a need for the warnings. *See United States v. Jackson*, 578 F.2d 1162 (5th Cir.1978). Further, recording undercover conversations in a noncustodial situation does not trigger *Miranda* rights. *United States v. Craig*, 573 F.2d 455, 474-75 (7th Cir.1977).

■ Jones objects to the monitoring of conversations between Jones and an informant because no warrant for this intrusion was obtained. Monitoring a conversation is permitted under 18 U.S.C. §§ 2511(2)(c) and (d) when one party to the conversation consents. No warrant is required when one participant consents because no interest legitimately protected by the fourth amendment is involved. *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). Jones was not relying on the privacy of a certain surrounding when he spoke to the informant, but "upon his misplaced confidence that [the informant] would not reveal his wrongdoing." *Hoffa*, 385 U.S. at 302, 87 S.Ct. at 413 (footnote omitted).

## IX.

■ Jones contends that the district court's application of the Criminal Justice Act, 18 U.S.C. § 3006A, violated his sixth amendment right to counsel. Jones's argument, essentially, is that because his court-appointed attorney was not paid enough for work done on this case, Jones was denied his right to counsel. Jones has a constitutional right to counsel, but not to counsel paid a certain fee. *See United States v. Robinson*, 553 F.2d 429, 430 (5th Cir.1977). Jones's counsel's attack on the pay rate under the Act is not a proper basis for reversing Jones's conviction.

## X.

■ Jones's final complaint is that the district court, 621 F.Supp. 383, improperly heard evidence of two assaults. The first is Jones's assault of Briscoe, and the second is Robert Crain's assault of Allan Koller. Crain was Jones's close associate and, at the time of the assault, threatened Koller that he would come back and beat him again if he did not pay the drug debt he owed Jones. Thus, both assaults were relevant to show that Jones acted in a supervisory position under 21 U.S.C. § 848. The trial court did not err in admitting evidence of the two assaults.

## XI.

■ Pfeister argues that he was deprived of his right to a speedy trial, guaranteed by the Speedy Trial Act, 18 U.S.C. §§ 3161–74, due to the lengthy delay between his arraignment and trial. Pfeister was arraigned on March 14, 1985, and tried September 6, 1985.

The Speedy Trial Act provides that a defendant shall be brought to trial within seventy days of his indictment or arraignment, whichever last occurred. 18 U.S.C. § 3161(c)(1). The seventy-day period may be tolled, however, for a variety of reasons provided by the act, including a delay occasioned by the filing, consideration, hearing, and disposition of any pretrial motion or by competency proceedings. 18 U.S.C. §§ 3161(h)(1)(F) and 3161(h)(1)(A).

Here, Pfeister filed numerous pretrial motions during the months of March and April, initially prompting the trial court to continue the trial from April 15, 1985, until May 13, 1985. Numerous other motions filed during the month of May by Pfeister and his codefendants occasioned a second continuance until June 10, 1985. This nearly two-month delay is "excludable" under the act.

On May 28, 1985, Jones requested a psychiatric examination. On June 12, 1985, the court granted the government's motion to consolidate Jones's and Pfeister's trials. On August 15, 1985, Jones was found competent to stand trial. The time period from the government's motion to consolidate through Jones's competency hearing, August 15, 1985, is also excludable. This excludable period applies to both Jones and Pfeister because a time exclusion applicable to one defendant applies to all codefendants. *United States v. Zielie*, 734 F.2d 1447, 1454 (11th Cir.1984), *cert. denied, sub nom., Gustafson v. U.S.*, 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Accordingly, due to the excludable periods of delay, the government was within the act's seventy-day period to bring Pfeister to trial.

We have considered all of the arguments and have found no error.

Affirmed.