972 F.2d 342
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Antonio BAUTISTA, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Roberto ORAMA, a/k/a Roberto Vargas, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Pedro SILVERIO, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Jose FERREIRA, Defendant-Appellant.
 No. 91-5593, 91-5594, 91-5601, 91-5613.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 10, 1992
Decided: July 22, 1992
 
 Argued: John Clifton Rand, Alexandria, Virginia, for Appellant Ferreira; Kenneth Norman Brand, Alexandria, Virginia, for Appellant Orama; Denise Jakabcin Tassi, Alexandria, Virginia, for Appellant Bautista; Joseph John McCarthy, Dawkins, Hanagan, McCarthy & Sengel, P.C., Alexandria, Virginia, for Appellant Silverio. Cynthia Ann Young, Organized Crime and Racketeering Section, United States Department of Justice, Washington, D.C., for Appellee.
 On Brief: Richard Cullen, United States Attorney, Fernando Groene, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 Before SPROUSE and HAMILTON, Circuit Judges, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 In November 1990, the appellants Jose Ferreira, Roberto Orama, Pedro Silverio, and Antonio Bautista were charged with twelve other defendants with various drug violations stemming from a drug operation in Alexandria, Virginia. The four appellants challenge their convictions and sentences, raising issues relating to the sufficiency of the evidence, the court's denial of a motion to suppress evidence, offense level determinations, and the prosecutor's comments during closing argument.* We affirm.
 
 
 2
 The government's evidence at trial established the following. Ferreira began selling cocaine in 1986 and operated a cocaine business out of a number of apartments in northern Virginia for four years. Each of the other appellants was involved in the drug business with Ferreira: Orama was one of Ferreira's main suppliers, Silverio distributed cocaine for Ferreira, and Bautista sold cocaine for Ferreira.
 
 
 3
 In 1987 and 1988, Ferreira employed several others to sell cocaine, including Juan Santiago, Carlos Rodriguez, and Juan Santana. Ferreira arranged for delivery and set the sale price. During the initial months of 1988, Ferreira's organization sold approximately one pound of cocaine every fifteen days. During the summer of 1988, the organization sold between one and two kilograms every week. By December, the organization was selling approximately one kilo every week to ten days.
 
 
 4
 In the spring of 1989, Ferreira returned to the Dominican Republic. In his absence, Orama, Silverio, and Santiago took over the drug business. When Ferreira returned to Virginia in October 1990, they, however, began to sell cocaine for Ferreira individually. On his return, Ferreira recruited additional runners to his organization: Giovanni Ladaga, Armando Garcia, Antonio Bautista, and Raul Torrento.
 
 
 5
 In November 1990, all four appellants were indicted for conspiracy to distribute five or more kilos of cocaine, 21 U.S.C. § 846, and for distribution and possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). Ferreira and Orama were additionally charged with engaging in a continuing criminal enterprise, 21 U.S.C. § 848, and Ferreira was also charged with use of a firearm during drug trafficking, 18 U.S.C. § 924(c)(1).
 
 
 6
 After a four day jury trial, Ferreira, Orama, and Silverio were convicted of conspiracy to distribute five or more kilograms of cocaine; Bautista was acquitted of the conspiracy count. All four appellants were found guilty of distributing cocaine. Ferreira and Orama were both found guilty of engaging in a continuing criminal enterprise; Ferreira was acquitted on the firearm charge. At sentencing, Ferreira received a life sentence, Orama 360 months, Silverio 151 months, and Bautista eighteen months.
 
 
 7
 On appeal, all four appellants argue there was insufficient evidence to sustain their convictions. In addition, Ferreira argues that the district court improperly denied his motion to suppress evidence obtained by a "clone" beeper and erred in calculating his offense level. Silverio argues that the court improperly determined the amount of drugs that was reasonably foreseeable to him, and that the prosecutor, during his closing rebuttal argument improperly commented on the appellants' failure to testify. We reject each argument in turn.
 
 FERREIRA
 
 8
 Ferreira first attacks his continuing criminal enterprise conviction, 21 U.S.C. § 848, contending that there was insufficient evidence to find that he supervised five or more persons. To sustain a conviction for engaging in a continuing criminal enterprise, the government must prove five elements: 1) the defendant committed a felony violation of the federal drug laws; 2) such violation was part of a continuing series of violations of the drug laws; 3) the series of violations were undertaken by defendant in concert with five or more persons; 4) the defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and 5) the defendant derived substantial income or resources from the continuing series of violations. United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989), cert. denied, 493 U.S. 1047 (1990).
 
 
 9
 In proving the "organizer or supervisor" element, the government is not required to prove that the five individuals were supervised at the same time, nor must the five individuals be under the direct or immediate control of the defendant. The defendant need only occupy a position of management. Id. at 891. Thus, a defendant may not insulate himself from liability by carefully pyramiding authority so as to maintain fewer than five direct subordinates. Id. A mere buyer-seller relationship, however, is not sufficient to prove a violation under section 848. United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989).
 
 
 10
 Ferreira contends that there was insufficient evidence to prove that he supervised and managed five individuals. He contends that Santiago, Carlos Rodriguez, and Santana were operators equal to or independent from Ferreira, and therefore Ferreira had no control over them. He contends that without these three individuals the government cannot reach the requisite five individuals.
 
 
 11
 While there is some testimony contradicting the government's theory that Ferreira was the head man in the drug organization, there is overwhelming evidence establishing that he was. Santiago testified that he was a runner for the Ferreira organization in 1987 and shortly before his arrest in November of 1989. Carlos Rodriguez testified that Ferreira asked him to come to Virginia from the Dominican Republic to sell cocaine and that upon arrival his duties were to sell cocaine and meet with clients. Will testified that Rodriguez was a runner for Ferreira and Santana testified that he was brought to Virginia to run drugs for Ferreira. It is undisputed that Rosa Rodriguez and Luisa Tabarez were responsible for bringing cocaine from New York to Virginia. Ferreira's argument that his relationship with Rosa Rodriguez and Tabarez was no more than a buyer-seller relationship is without merit. There is also testimony in the record that many others assisted Ferreira in selling drugs, including Ernesto Rosario, Pedro Silverio, Giovanni Ladaga, Raul Torrento, Karla Ramirez, and Antonio Bautista.
 
 
 12
 Ferreira also attacks his continuing criminal enterprise conviction on grounds that he did not receive substantial income from the enterprise. In support, he argues that: 1) the government admitted to the trial court that Ferreira had no personal property to forfeit, 2) he shared modest apartments with other individuals, 3) there is no evidence he engaged in a lavish lifestyle, 4) drug sales were primarily in gram quantity, and 5) a large amount of drugs was consumed by the participants.
 
 
 13
 Although the statute does not prescribe the minimum amount of money required to constitute substantial income, this element is met where "tens of thousands" of dollars from a drug business move in and out of a defendant's possession. See United States v. Webster, 639 F.2d 174, 182 (4th Cir.), cert. denied, 454 U.S. 857 (1981). See also United States v. Jones, 801 F.2d 304, 310-11 (8th Cir. 1986) ("substantial" income found where defendant received $150,000 from drug sales).
 
 
 14
 Rodriguez testified that during the initial months of 1988, the organization sold approximately one pound of cocaine every fifteen days. Santiago testified that during the summer of 1988, the organization was selling as much as two kilograms of cocaine per week. Santana testified that in December of 1988, the organization would sell one kilo every week to ten days and that during this time they bought cocaine for $15,000 per kilo and sold it for $35,000 per kilo. Valdes testified that she purchased one-to-two ounces of cocaine a day from Santiago from mid-1987 through 1990, and that she paid between $700-$800 an ounce. Torrento testified that he made five trips to New York to pick up cocaine for Ferreira prior to his arrest in November of 1990. Thus, Ferreira's contention that he did not derive substantial income from the enterprise is implausible.
 
 
 15
 Ferreira also argues that the district court erred in denying his motion to suppress evidence obtained by means of a clone beeper on two grounds: that the affidavits in support of the warrant omitted information and thus violated the principle of Franks v. Delaware, 438 U.S. 154 (1978), and that clone beepers are subject to the minimization requirements of 18 U.S.C. § 2518.
 
 
 16
 Electronic eavesdropping by law enforcement personnel is subject to the statutory limitations set forth in the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. Section 2518(3)(c) requires that, before a judge approves the interception of wire or oral communications, he must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried.... " This circuit has held, however, that the police need not exhaust every conceivable technique before making an application for a wire tap. See United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977), cert. denied, 436 U.S. 930 (1978).
 
 
 17
 On March 20, 1990, and April 26, 1990, a judge authorized electronic surveillance of Ferreira through clone beepers. In support of the warrant, the government submitted affidavits stating that: 1) interception of electronic communications was the only available technique which was reasonably likely to secure evidence necessary to prove beyond a reasonable doubt that Ferreira was engaged in narcoticsrelated offenses, 2) normal investigative procedures were too dangerous and unlikely to succeed, 3) physical surveillance was of limited value, 4) subpoenaing witnesses was unlikely to succeed because most would probably not cooperate, and 5) use of informants was not helpful because they had little contact with high level members of the organization.
 
 
 18
 Ferreira argues that the court erred in not suppressing the evidence obtained through the clone beepers because the affidavit submitted in support of the warrant application omitted information with regard to the strength of the government's case and the successes of its prior investigations. This argument is meritless. The affidavits provided sufficient detail of the necessity for electronic surveillance and explained why other routine investigatory techniques would not be successful. As we stated in Clerkley, 556 F.2d at 715, the police need not exhaust every conceivable technique before making an application for an electronic tap.
 
 
 19
 Ferreira also claims that the district court erred in finding that "clone" beepers are not subject to the minimization requirements of 18 U.S.C. § 2518(5). Section 2518(5) requires wire or oral interceptions to "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." The statute does not require that all innocent communications be left untouched. Rather, it simply requires that unnecessary intrusions be minimized or reduced to the smallest degree possible. Clerkley, 556 F.2d at 716. In determining whether the minimization requirements of section 2518(5) have been met, the courts apply a standard of reasonableness on a case-by-case basis. Id.
 
 
 20
 The Second Circuit in United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989), held that the minimization requirements of section 2518(5) are not applicable to clone beepers. That court reasoned that clone beepers have a small degree of intrusiveness because, like pen registers and unlike telephone wiretaps, clone beepers reveal only numbers rather than the content of the conversations. Id. at 1141.
 
 
 21
 We agree with the reasoning and conclusion of the Tutino court. Moreover, even if clone beepers were subject to the minimization requirements of section 2518, Ferreira has failed to indicate how the alleged intrusiveness of the beepers could have been minimized.
 
 
 22
 Ferreira lastly attacks his sentence, claiming three errors: (1) the district court incorrectly attributed 200 kilograms of cocaine to Ferreira; (2) the district court incorrectly interpreted the Guidelines in determining his offense level; and (3) the district court erred in enhancing his offense level by two points for obstruction of justice.
 
 
 23
 In his first attack, Ferreira argues that the court grossly overstated the amount of drugs involved in the organization. He argues that, viewed in the light most favorable to the government, the evidence established that it is unlikely that the conspiracy ever sold more than fifty kilograms of cocaine. We disagree. Ferreira's drug organization existed for four years and, as the evidence delineated above makes clear, during this time it distributed large quantities of cocaine. Therefore, the court's determination that Ferreira was responsible for 200 kilograms of cocaine was not clearly erroneous.
 
 
 24
 Ferreira also attacks the court's reading of the applicable sentencing guidelines. Pursuant to U.S.S.G. § 2D1.1(c), the trial court assigned Ferreira an offense level of 38 based on 200 kilos of cocaine. Application Note 12 to that Guideline states that drugs not specified in the counts of conviction may be considered in determining the offense level. Section 2D1.5 states that in determining the offense level for a continuing criminal enterprise, the court must pick the greater of "4 plus the offense level of § 2D1.1 applicable to the underlying offense; or 38." The court applied the first option, giving Ferreira a base offense level of 42.
 
 
 25
 Ferreira argues that the language "underlying offense" in section 2D1.1 means he should only be held responsible for the amounts for which he was convicted, not for the amounts included in his conspiracy conviction which were mandatorily set aside because of the CCE conviction. See United States v. Porter, 821 F.2d 968, 978 (4th Cir. 1987) (defendant cannot be sentenced under both a drug conspiracy conviction and the CCE statute), cert. denied, 485 U.S. 934 (1988). The amounts underlying his distribution offense totaled 916 grams of cocaine, constituting an offense level of 28. Thus, in applying 2D1.5, Ferreira argues that the district court should have arrived at an offense level of 38, not 42. Ferreira's argument is incorrect. The offense level of section 2D1.1 is determined by the amounts involved in the conviction, which includes relevant conduct. Thus, the 38 base offense level was appropriate, and, in applying section 2D1.5, a base offense level of 42 was correct.
 
 
 26
 Ferreira lastly argues that the district court erred in enhancing his offense level for obstruction of justice. Santiago testified at sentencing that prior to trial Ferreira "told me to say that the cocaine from on the turnpike wasn't mine and it wasn't his, it was Eddie's, Eddie Crist's. Like they don't have enough evidence on us." Rodriguez testified that Ferreira told him "that I shouldn't plead guilty." Santana testified that Ferreira stated to him, "there was no case." The court gave a two-point enhancement for obstruction of justice.
 
 
 27
 Ferreira argues that his statements to Rodriguez and Santana do not rise to the level of obstruction because his comments were no more than opinions. He argues further that his comments to Santiago do not constitute an obstruction of justice because they were true-he claims that the cocaine belonged to Eddie Crist. We believe that the two point enhancement was appropriate because Santiago expressly established that the cocaine was in fact Ferreira's, and, in urging Santiago to deny that the cocaine was Ferreira's, Ferreira was clearly attempting to influence a witness. Because Santiago's testimony clearly establishes obstruction of justice, the court did not have to rely upon the other two comments, and we express no opinion as to them.
 
 ORAMA
 
 28
 Orama, like Ferreira, also argues that there was insufficient evidence to convict him of engaging in a continuing criminal enterprise because he did not manage five or more people. Orama concedes that the government established that he managed or supervised Carlos Rodriguez, Benito Rodriguez, and Pedro Silverio, but denies that he oversaw others.
 
 
 29
 This argument is without merit. Not only did the evidence establish that Orama oversaw Carlos Rodriguez, Benito Rodriguez, and Pedro Silverio, but there was evidence that he also oversaw and directed Juan Santiago, Joyce Peterson, and Luisa Tabarez.
 
 SILVERIO
 
 30
 Silverio first argues that there was insufficient evidence to convict him of distributing cocaine on or about June 20, 1989. Silverio argues that the government failed to meet its burden of proof that he distributed cocaine on or about June 20, 1989, because: 1) it failed to demonstrate that he distributed cocaine at any time in June 1989, and 2) it did not offer any expert testimony identifying the substance distributed as cocaine.
 
 
 31
 Vientidos testified that she and Benito Rodriguez sold drugs to an undercover police officer after Silverio was called to set up the buy. She did not state when the buy took place. Benito Rodriguez, however, did not arrive in the United States until May 29, 1989, and he and Silverio were arrested on July 25, 1989. Given Benito Rodriguez's involvement, the undercover buy discussed above must have occurred around June 1989. The exact date of distribution is not critical.
 
 
 32
 In support of his argument requiring expert testimony, Silverio cites United States v. Haro-Espinosa, 619 F.2d 789 (9th Cir. 1979), and United States v. Ortiz, 610 F.2d 280 (5th Cir.), cert. denied, 445 U.S. 930 (1980). Those cases, however, are inapposite. This circuit, as well as other circuits, hold that expert testimony is not necessary to establish the identity of the substance involved in an alleged narcotic transaction as long as there is sufficient direct and circumstantial evidence. See, e.g., United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir. 1976); United States v. Schrock, 855 F.2d 327, 334 (6th Cir. 1988). Many witnesses testified that Silverio distributed cocaine. Their familiarity with cocaine was overwhelmingly established because they were admitted drug dealers and users.
 
 
 33
 Silverio next argues that the district court incorrectly held him responsible for twenty-five kilos of cocaine. Testimony at trial established that Silverio was a member of the organization for seven months. There was testimony that the organization's New York supplier provided between three and four kilos of cocaine a month during this period. Thus, the district court's conclusion that Silverio was involved with twenty-five kilos of cocaine is not clearly erroneous.
 
 
 34
 Lastly, Silverio argues on behalf of all the appellants, except Bautista (who testified at trial), that the government's rebuttal argument to the jury impermissibly remarked on the appellants' right to remain silent in contravention of their Fifth Amendment rights. The following exchange took place during the government's rebuttal argument to the jury:
 
 
 35
 MR. FREDERICKSEN [for the government]: ... In a case like this, if you ask yourself-You know, step back a little bit, as we all try to do, to get some perspective. And look at what the Government has done in its case. Look at what the defense has done. And ask yourself, where is the, you know, the defense here? Unrebutted is the Government's case.
 
 
 36
 MS. KEMLER: Your Honor, I am going to have to make an objection. There is no burden on the defendant to come forward with any evidence. And I think that is clearly the implication in stating that.
 
 
 37
 MR. McCARTHY: Particularly if we are talking about things that are unrebutted and not things that we said.
 
 
 38
 THE COURT: That's correct. And I will tell them the defendants does [sic] not have to come forward.
 
 
 39
 MR. FREDERICKSEN: Certainly. And I would be the first to agree with you. If I may finish. I guess my thought is, the point is the Government's evidence stands completely unrebutted.
 
 
 40
 MR. McCARTHY: That is not rebuttal.
 
 
 41
 MR. FREDERICKSEN: Your Honor, may I make my argument. It is a proper argument.
 
 
 42
 THE COURT: Objection overruled.
 
 
 43
 MR. FREDERICKSEN: Thank you. The Government put on over 25 witnesses. The Government presented you with 15 people who are going to jail, prison. The Government presented you with an avalanche of evidence here. And you heard no one come and tell you otherwise about this.
 
 
 44
 MS. KEMLER: Your Honor, I have to object. There is no burden on the defendant to come forward with any evidence.
 
 
 45
 THE COURT: Objection overruled. I said I will instruct the jury.
 
 
 46
 Whether a remark constitutes an improper comment on a defendant's failure to testify is judged under the following rule: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973), aff'd, 417 U.S. 211 (1974) (citations and internal quotation marks omitted). An impermissible comment on a defendant's failure to testify requires reversal of the conviction unless the comment is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967).
 
 
 47
 In United States v. Lorick, 753 F.2d 1295 (4th Cir.), cert. denied, 471 U.S. 1107 (1985), the prosecutor during closing arguments stated: "I would say who do you believe? Eight professional law enforcement officers. One Major, four lieutenants, three officers, all sworn to uphold the law, all taking the oath as a witness; or four convicted felons, the four that testified." Id. 1297-98. This court held that the comment did not impermissibly impinge the Fifth Amendment rights of the defendant who did not testify because the jury would not naturally take the statement as a comment on that defendant's refusal to testify, but as a credibility argument on the four defendants who did testify. In addition, the trial court's instructions to the jury to ignore the defendant's refusal to testify cured any conceivable improper impression created by the comment. Id. at 1298.
 
 
 48
 While it is true that a prosecutor may comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence, United States v. Borchardt, 809 F.2d 1115, 1119 (5th Cir. 1987), the statement "[a]nd you heard no one come and tell you otherwise about this," we believe skirts the precipice of reversible error. We admonish the government for this kind of haphazard summation for it is close to grounds for reversal in an otherwise well-tried case. We affirm in spite of this transgression, however, because the trial judge's curative instructions made this comment harmless beyond a reasonable doubt and because there was overwhelming evidence of guilt.
 
 BAUTISTA
 
 49
 Bautista makes only one argument on appeal. He argues that his conviction for distributing cocaine on November 1, 1990, should be reversed because he did not know he was distributing cocaine. At trial, Armando Garcia, Karla Ramirez, and Raul Torrento testified against Bautista. Garcia testified that Ferreira told him that he brought Bautista from New York to Virginia to sell drugs and that Garcia met Bautista in a Safeway parking lot after calling Ferreira to deliver cocaine. Ramirez testified that she had purchased cocaine from Bautista. Torrento testified that Ferreira also told him he brought Bautista from New York to sell drugs, and that he saw Bautista deliver drugs for Ferreira on three or four occasions. He further testified that on November 1, 1990, he and Bautista delivered drugs and that upon returning to Ferreira's apartment, Bautista handed Ferreira the money from the drug sale.
 
 
 50
 In his defense, Bautista testified that on November 1, 1990, Torrento gave him a package wrapped in paper towels with rubber bands around it to hold while Torrento drove. Further, Torrento instructed him to give the package to a man in a parking lot and when he did this the man gave him an envelope. He testified that he did not know what was in the package and that he received nothing for going with Torrento. He stated that he stayed at Ferreira's apartment because he was new in the area and had no other place to go and that he never saw drugs in the apartment.
 
 
 51
 In light of the overwhelming evidence establishing that he was delivering drugs, the jury was entitled to reject Bautista's testimony as not credible.
 
 AFFIRMED
 
 
 *
 Ferreira and Orama raise additional arguments in their pro se supplemental brief. We find these additional arguments without merit